OPINION. Van Fossan, Judge: The first issue is whether the income of the four trusts created by the petitioners for the benefit of their two minor children is includible in the petitioners’ gross community income under the provisions of section 22 (a) of the Internal Revenue Code. The general theory under which the income of a trust is taxed to the . grantor under section 22 (a) is that one should be taxed on income which one is “free to enjoy at his own option,” subject to “unfettered command.” Under this broad general power, a host of cases have been decided' following Helvering v. Clifford, 309 U. S. 331, which cases have explored almost every conceivable argument in their resolution of the problem. Since the question is largely factual, out of this maze of litigation there has developed no single test or rule which we may apply. It will serve no useful purpose, therefore, to probe anew among these cases in the hope of finding an exact factual duplicate of the instant case or to seize upon some one set of facts which in a particular case has been held to be controlling. The respondent contends that the petitioners have the power to control the beneficial enjoyment of both the income and corpus of the trust and that this is tantamount to ownership of such income. The terms of the trust do not permit the beneficial enjoyment of the income by one other than the trust beneficiary. True, the trustee may withhold the income, but this in itself does not make the income subject to use by the trustee for his own purposes. Such a use would violate the trust purpose. The trust instruments provide that none of the income or corpus shall be used for the “support, maintenance or education of the beneficiary * * The respondent alludes to the use by the trustee of part of the trust income for payment of the tuition of one of the beneficiaries, which sums were returned to the trust by the trustee on advice of counsel. We do not think this isolated event should control the decision. It is only a factor to consider. The respondent further contends that in the event one beneficiary predeceases the other and leaves issue surviving, the trustee can not only accumulate or distribute that beneficiary’s share of the income, but can apportion it among the successor beneficiaries as he desires. The trust instruments provide that such interest as the deceased beneficiary would have received “shall be paid over to his child or children, subject to all the terms and conditions of this trust: * * It is not implied in these terms that the trustee is given authority to apportion the trust benefits among the survivors of the deceased beneficiary as he sees fit. The rights of the surviving children or a beneficiary would be preserved and protected in a court of equity following such unjust apportionment by the trustee. The possibility that the trustee may mismanage the trust should not bear great weight in deciding whether or not the trust income is in fact income to the grantor, regardless of the fact that the grantor and trustee are one. The respondent points to the fact that in 1943 Fischer invested $7,000 for the trust in one-fourth of his interest in a block of gas leases. The first well drilled on these leases turned out to be dry. Fischer had to put up $5,000 as his share of the cost of drilling a second well. This amount was based on Fischer’s aliquot interest in the leases before he transferred one-fourth of these interests to the trusts. Fischer then paid $1,250 out of the trust funds as the trust’s share of the cost of drilling the second well. This second well was also dry and the leases were abandoned. The respondent contends that Fischer satisfied a personal obligation out of the trust funds, in violation of the trust, agreements, thereby indicating the real nature of the trusts. We can not agree that Fischer’s acts in this respect are susceptible of the implication that the respondent would make. We are not unaware that certain principles of equity, if applied to the management of the trusts in the instant case, might find in Fischer’s management such a degree of laxity as would permit him personally to be held liable for the losses suffered by the trust. These principles, however, do not dictate a finding here that the income of the trusts was in fact income to Fischer and his wife.. The correct solution to this problem requires an answer to the query, Was the “bundle of rights” retained by the grantors of these trusts shown to be sufficient to warrant the taxation of the trust income to the petitioners ? Our answer is that there was not here such a retention of rights as to attribute taxability to petitioners. We are accordingly of the opinion that the trust income should not be taxed to the petitioners, and we so hold. The second issue is whether or not the receipt by petitioner L. M. Fischer of $15,000 from the Agua Dulce Co., in return for the transfer to that company of an undivided one-fourth share of his interest in the block of oil and gas leases known as the Banquette leases, constituted a sale by Fischer. The petitioners contend that the Agua Dulce Co., Graham, and L. M. Fischer were engaged in a joint venture and that the payment by the Agua Dulce Co. for a one-fourth interest in Fischer’s interest in the leases was an equalization of the cost of the leases among the parties. The respondent contends that the payment by the Agua Dulce Co. to Fischer was a sale on which Fischer realized a gain. The petitioners’ contention that this was a joint venture is first made in their amended petition. In the original petition the statement is made that Fischer “sold one-half of his remaining interest in the block of leases for the sum of $15,000.” Whether the transaction was a joint venture or a sale depends on the facts. In this connection, petitioners have shown us no facts nor given us any reasons which are persuasive in support of their present claim that Fischer participated in a joint venture in respect of the Banquette leases and did not make a sale of part thereof. Therefore, the respondent is sustained in his contention that Fischer sold to the Agua Dulce Co. part of his interest in the Banquette leases, on which sale a gain was realized. The third issue is whether this gain is a short term or a long term capital gain. On August 7, 1943, the Agua Dulce Co. accepted Fischer’s offer to the effect that if the Agua Dulce Co. would then pay Fischer $15,000, at the election of the Agua Dulce Co., Fischer would either assign to i t one-fourth of his interest in the leases, or repay the $15,000, with interest at 6 per cent, out of the production of gas discovered on the leases. On August 6, 1943, the Agua Dulce Co. had sent Fischer a check for $15,1)00. On December 27,1943, the Agua Dulce Co. wrote to Fischer, stating that it was electing to take a conveyance of one-fourth of Fischer’s interest in the Banquette block rather than a repayment of the $15,000. On December 31, 1943, Fischer conveyed this interest to the Agua Dulce Co. The question is, When was the sale made — on August 7, December 27, or December 31 ? The respondent offers no argument on this point in his brief, but in his notice of deficiency he treated all of the leases as having been held for less than six months, resulting in a short term gain. This would imply that he considered the sale to have been made on August 7,1943, since the leases were acquired in June, July, and August of 1943. In our opinion the sale was made on December 31, 1943, when Fischer made a formal conveyance to the Agua Dulce Co. of one-fourth of his interest in the leases. Until this conveyance was made, the Agua Dulce Co. had no rights in the property other than its contractual rights under the agreement of August 7 and the letter of December 27, 1943, exercising its right to an option. The sale having been made on December 31,1943, the gain will be taxed accordingly. The fourth issue is whether or not the petitioners’ investment in the Banquette leases became worthless in 1943. Prior to December 31, 1943, when the petitioners wrote off their investment in these leases, they had been advised by geologists that, since the well already drilled in the most favorable location in the block had proved to be dry, the leases were worthless. The controversy arises from the fact that Fischer was persuaded by the Agua Dulce Co., which was in need of a gas supply, to invest with that company in the drilling in 1944 of another well on the leases. In order to get Graham to drill another well, the Agua Dulce Co. agreed to pay $15,000 of the $20,000 dry hole money that Graham demanded as reimbursement for the cost of the second well in the event it also turned out to be dry. Petitioner agreed to put up the remaining $5,000 as his share. The respondent contends that this transaction in 1944 indicates that Fischer did not really consider the leases worthless in 1943 and that they actually possessed value after that year. We agree with the respondent. If we had before us only the drilling experience of 1943, we might be persuaded that petitioner was justified in claiming a deduction, but when we look at 1944 we find petitioner making a further investment of $5,000 in the drilling of the second well. This action did not corroborate, rather it negatives, the petitioner’s claim of worthlessness. The record does not convince us that the $5,000 was an investment in extremis — a desperate attempt to salvage something from the ruins of a former large investment. Rather, it speaks more loudly than petitioner’s words of protest of a persisting value in the leases as gas and oil property. Oh the whole record, we conclude that the leases did not become worthless until they were abandoned after the second well proved to be a dry hole. Since this occurred in 1944, it follows that petitioner was not justified in claiming a deduction for worthlessness of his investment in 1943. The fifth issue is whether or not a check in payment of legal services rendered, received by petitioner L. M. Fischer on December 31,1942, but not deposited for collection until February 10, 1943, constituted taxable income to the petitioner in 1942. The petitioners contend that the payment on the check in February, 1943, related back to the time the check was delivered. In support of this view, the petitioners cite Estate of Modie J. Spiegel, 12 T. C. 524, and Estate of M. A. Bradley, 19 B. T. A. 49. The cases cited by the petitioners support the familiar theory that, under certain circumstances, payment on a check relates back in point of time to the date of delivery. This theory, however, is not dispositive of this issue, because here we have the impact of an oral condition imposed at the time of delivery of the check which restricts the time when the proceeds of the check may be collected. The obvious fact is that the check was not income to Fischer in 1942. He could not use the money in that year. What he did receive was in 1942 still subject to a very substantial restriction, arising- from his agreement that he would not deposit the check until after the first of the year 1943. Income is not realized until the taxpayer has the funds under his dominion and control, free from any substantial restriction as to the use thereof. This principle of our tax law is now too familiar to require citation. On this issue, therefore, we sustain the respondent in his contention that the check was not income in 1942, when it was received. Decision will be entered under Rule 50