O'NEIL AND MARTHANN BENNETT, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 662–78—664–78.     Filed September 15, 1982.

*Lewis H. Mathis, Byron M. Eiseman, Jr.,* and *William H. Sutton,* for the petitioners.
*Deborah A. Butler,* for the respondent.

TANNENWALD, *Chief Judge*: Respondent has determined deficiencies in petitioners' Federal income taxes as follows:

---

[1]Cases of the following petitioners are consolidated herewith: Jesse O. and Gertrude Bennett, docket No. 663–78; Wayne and Betty Ann Bennett, docket No. 664–78.

| Docket No. | Petitioners | 1973 | 1974 |
|---|---|---|---|
| 662–78 | O'Neil and Marthann Bennett | $31,060 | $39,642 |
| 663–78 | Jesse O. and Gertrude Bennett | 31,000 | 38,319 |
| 664–78 | Wayne and Betty Ann Bennett | 31,060 | 38,893 |

Due to concessions by petitioners, the only issue for decision is whether the income of a trust created by petitioners is taxable to petitioners pursuant to section 674(a)[2] or section 675(3).

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated by this reference.

Petitioners O'Neil and Marthann Bennett, Jesse O. and Gertrude Bennett, and Wayne and Betty Ann Bennett were residents of Lonoke, Ark., when they filed their petitions herein. Petitioner Jesse O. Bennett (also known as J. O. Bennett) is the father of petitioners O'Neil Bennett (also known as Neil Bennett) and Wayne Bennett. Jesse O. Bennett, O'Neil Bennett, and Wayne Bennett will sometimes be referred to collectively as "the Bennetts."

J. O. Bennett & Sons (Bennett & Sons or the partnership) was a general partnership organized and operated under the laws of the State of Arkansas. Bennett & Sons was engaged in farming and had constructed three nursing homes which were leased to unrelated parties. Jesse, Neil, and Wayne shared equally in the capital, profits, and losses of Bennett & Sons. The partnership was in existence prior to January 1, 1963, and terminated on or about January 8, 1974.

On or about January 1, 1963, petitioners, as grantors, created two separate trusts, which were designated the Wayne Bennett Family Trust and the Neil Bennett Family Trust. The primary beneficiaries of the Wayne Bennett Family Trust were the two children of Wayne and Betty Ann Bennett— Wayne Bennett, Jr., and Edwin McHaney Bennett. The primary beneficiaries of the Neil Bennett Family Trust were

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

the three children of Neil and Marthann Bennett—Beverly Bennett, Daina Bennett, and Neil Bennett, Jr.[3]

The ages of the trust's primary beneficiaries on the date the trust was created (Jan. 1, 1963) and during the years in issue were as follows:

|  | *Jan. 1, 1963* | *1973* | *1974* |
|---|---|---|---|
| Beverly Bennett (Walker) | 13 | 23 | 24 |
| Daina Bennett | 9 | 19 | 20 |
| Neil Bennett, Jr. | 7 | 17 | 18 |
| Wayne Bennett, Jr. | 15 | 25 | 26 |
| Edwin McHaney Bennett | 7 | 17 | 18 |

Wayne and Neil Bennett were appointed trustees.

The trust agreement provided in part as follows:

WHEREAS, despite the fact that the real property hereby committed to trust is owned by and is an asset of the aforesaid partnership and by express provision of the Uniform Partnership Act of Arkansas becomes personal property which may be transferred out of the partnership, as an entity, without the need of relinquishment of dower by the wives of the three partners, they are joining in execution of this trust indenture in an abundance of caution and to make it clear to any and all third parties that such interest, if any, which they own or may have acquired in the said trust property is by this instrument committed to and conveyed into trust as herein provided.

1. *Trust Property.* The Grantors, desiring to create trusts for the benefit of the children and grandchildren * * * hereby irrevocably assign to the Trustees [three properties on which Bennett and Sons had constructed nursing homes] * * *

2. *Dispositive Provisions.* * * *

(a) *Income Payments.* The Trustees shall pay the entire net income of each of the trusts at least annually to the primary beneficiaries of each such trust, the same to be subdivided between them equally; that is to say, the income of the Wayne Bennett Family Trust shall be divided equally between his two children above-named, and the income of the Neil Bennett Family Trust shall be divided one-third each between his children above-named.

(b) *Term of Trust.* These trusts shall terminate at the end of day December 31, 1975 * * *

(c) *Other Beneficiaries.* If a primary beneficiary * * * shall die before termination of this trust * * * , the interest of such deceased child herein, together with any undistributed income, shall devolve to the issue of such beneficiary then living, in equal shares, and as subdivided, continue to be held in trust; but if there be no such issue, then to the other primary

---

[3]Because the trusts were administered as if only one trust existed, we shall hereinafter refer to them as a single trust.

beneficiary (equally, if two beneficiaries) of his or her family trust * * * if living, to be added to, held, administered, and distributed as part of the trust herein set apart for such other primary beneficiary; but if no other beneficiary or beneficiaries be then living, then, in trust, to the then living issue of such other beneficiary or beneficiaries in equal shares; and if there be no such issue, then to the primary beneficiaries of the other Bennett family trust hereby created * * * to be added to, held, administered, and distributed as part of the trust set apart for such beneficiaries; but if such beneficiaries be not then living, then in trust to the then living issue of such beneficiaries in equal shares.

If no child or issue survive the trust termination date above-provided, the date of death of the last Bennett descendant shall constitute the termination date of this trust, and the trust estate of each said trust shall be split equally between Wayne Bennett and Neil Bennett, if living, or, if not, their heirs at law * * *

*     *     *     *     *     *     *

3. *Trustees' Powers.* In the administration of the trusts, the Trustees shall have the following powers, all of which shall be exercised in a fiduciary capacity, primarily in the interest of the beneficiaries:

*     *     *     *     *     *     *

(b) To rent or lease any property of the trusts for such time and upon such terms and for such price or prices as in their discretion and judgment may seem just and proper and for the best interest of the trusts and the beneficiaries hereunder, irrespective of the provisions of any statute or of the termination of any trust.

*     *     *     *     *     *     *

(l) To lend money to any person or persons upon such terms and in such ways and with such security as they may deem advisable for the best interest of the trusts and the beneficiaries hereunder.

(m) To engage in business with the property of the trusts as sole proprietor, or as a general or limited partner, with all the powers customarily exercised by an individual so engaged in business, and to hold an undivided interest in any property as tenant in common or as tenant in partnership.

*     *     *     *     *     *     *

(p) The Trustees may freely act under all or any of the powers by this agreement given to them in all matters concerning the trusts herein created, after forming their judgment based upon all the circumstances of any particular situation as to the wisest and best course to pursue in the interest of the trusts and the beneficiaries hereunder, without the necessity of obtaining the consent or permission of any person interested therein, or the consent or approval of any court, and notwithstanding that they may also be acting individually, or as trustees of other trusts, or as agents for other persons or corporations interested in the same matters, or may be interested in connection with the same matters as stockholders, directors, or otherwise, provided, however, that they shall exercise such powers at all times in a fiduciary capacity primarily in the interest of the beneficiaries hereunder.

\*      \*      \*      \*      \*      \*      \*

4. *Limitation on Powers.* Notwithstanding anything herein contained to the contrary, no powers enumerated herein or accorded to trustees generally pursuant to law shall be construed to enable the Grantors, or the Trustees, or either of them, or any other person to purchase, exchange, or otherwise deal with or dispose of all or any part of the corpus or income of the trusts for less than an adequate consideration in money or money's worth, or to enable the Grantors to borrow all or any part of the corpus or income of the trusts, directly or indirectly, without adequate interest or security. \* \* \*

\*      \*      \*      \*      \*      \*      \*

12. *Irrevocability.* The trusts shall be irrevocable \* \* \*

By quitclaim deeds dated December 31, 1963, the nursing home properties were conveyed to Wayne and Neil as the trustees under the trust agreement.[4] The nursing homes, leased to third parties unrelated to petitioners, were known as Lonoke Nursing Home, Inc., Cedar Lodge Nursing Home, Inc., and Linda Loma Nursing Home, Inc. The trust assumed the outstanding mortgages on the nursing homes and land.

During the early years of the trust, its income consisted entirely of rentals from the nursing homes.

On or about June 5, 1973, a document entitled "Lease Agreement" was executed. The lessors were Jesse, Wayne, and Neil, and the lessees were Lonoke Nursing Home, Inc., and Cedar Lodge Nursing Home, Inc.[5] Each lease was for a 5-year term and included a 5-year renewal period at the lessee's option. No written lease existed for the Linda Loma Nursing Home, Inc. Several of Lonoke Nursing Home, Inc.'s rental checks for 1974 were made out to Jesse, who was not a trustee of the trust. Jesse endorsed these checks and they were deposited in the trust's checking account at First State Bank of Lonoke, Ark.

The trustees did not distribute annually all of the trust's net income. Throughout the life of the trust, their practice was to actually disburse only enough cash to the beneficiaries to enable them to pay their personal income taxes on their distributive shares of the trust's net income.[6] The trustees

---

[4]The record does not disclose why the quitclaim deeds were not executed until Dec. 31, 1963.

[5]The agreement included two separate lease arrangements between the Bennetts and the two nursing home corporations.

[6]In some instances, the trustees distributed more income to a particular beneficiary than

applied some of the income to the payment of the indebtedness on the properties. The remainder of the income was retained and reinvested. Wayne and Neil thought that they were operating the trust in accordance with the provisions of the trust instrument and their accounts were reviewed annually by a certified public accountant. The trust maintained its own checking account, which was used for depositing rent and interest and for payment of expenses.

The trustees invested the undistributed income in loans to Bennett & Sons, "participation loans" to various entities, and certificates of deposit. Between July 19, 1966, and April 13, 1972, the trust made loans to Bennett & Sons totaling $426,000. The loans were represented by 38 separate promissory notes and bore interest at the annual rate of 5 or 6 percent. The loans were not paid on their due dates[7] and no documents were executed evidencing their renewal.

On or about January 8, 1974, J. O. Bennett & Sons, Inc. (the corporation), was formed under the laws of Arkansas. The assets of the partnership were transferred to, and the liabilities of the partnership were assumed by, the corporation. The shares of stock in the corporation were distributed to the Bennetts in the same ratio in which they shared in the capital, profits, and losses of the partnership.[8] On June 15, 1974, the trust loaned the corporation $20,000 at an annual interest rate of 6 percent. This loan was due January 1, 1975. On December 31, 1974, loans totaling $446,300 were payable by Bennett & Sons to the trust.

The loans made by the trust to Bennett & Sons were unsecured. The loans were used by the partnership and corporation as working capital and/or to meet its operating expenses. In 1973, Bennett & Sons borrowed funds from an unrelated commercial bank at 5½- to 5¾-percent annual interest. The loans from the commercial bank were secured.

Using accumulated trust income, the trustees purchased certificates of deposit of the First State Bank of Lonoke, Ark.

---

was needed to pay his or her taxes in order that each child's share of the accumulated income would be the same as his or her share of the current income (i.e., one-fourth to each of Wayne's children and one-sixth for each of Neil's children).

[7] The first loan was due on July 19, 1967.

[8] For convenience, we will sometimes refer to both the corporation and the partnership as Bennett & Sons.

(FSB). On January 1, 1973, and January 1, 1974, the trust owned certificates of deposit at FSB which were valued at $165,741.92 and $64,639.74, respectively.

The trust joined with FSB in making "participation loans"[9] to various borrowers. The trust's share of each participation loan bore the same interest as FSB's share. On January 1, 1974, the trust owned notes receivable in the amount of $203,152.36 which represented amounts invested in loan participations with FSB. During the years 1973 and 1974, the petitioners owned 51½ percent of the outstanding shares of stock of FSB. Jesse served as the president of FSB, and Wayne and Neil served on FSB's board of directors.

During 1973 and 1974, the trust received the following gross rents and interest and claimed the following deductions for amounts credited and distributed to beneficiaries:[10]

| Year | Rent from nursing homes | Interest | Credited and distributed to beneficiaries |
|---|---|---|---|
| 1973 | $136,450 | $30,984.43 | [1]$145,304.16 |
| 1974 | 161,700 | 44,794.69 | 183,324.61 |

[1] Although the parties have stipulated that the trust's 1973 distributions deduction is $144,304.16, the trust's 1973 Form 1041 shows a distributions deduction of $145,304.16.

Of the interest income received by the trust, $22,754 in 1973 and $23,404 in 1974 represented interest payments from Bennett & Sons. The trust made actual distributions to the beneficiaries totaling $65,779.28 and $64,222 in 1973 and 1974, respectively. As of December 31, 1974, the total amount due the beneficiaries from the trust was $806,930.65.

On December 31, 1975, the trust was terminated pursuant to its terms. On that date, Bennett & Sons retired its outstanding debt to the trust in the total amount of $469,704, which

---

[9]Because of lending limits based upon the capital structure of a bank, it is common practice for banks to join with an outside investor in making loans in amounts which exceed the bank's lending limit. These loans are referred to as "participation loans."

[10]The trust also claimed deductions for real estate taxes, depreciation, and administrative expenses of $22,130.27 and $23,170.08 for 1973 and 1974, respectively. The amounts labeled on the trust's return as credited and distributed to beneficiaries represent the amounts available for distribution, i.e., income less expenses; the claimed distributions were not, in fact, made in full.

represented principal of $446,300 and accrued interest of $23,404 for 1975. A check for $469,704 from Bennett & Sons was deposited in the trust's checking account on December 31, 1975. The trust properties were distributed to the Bennett Family Partnership, a partnership composed of the five Bennett children. The Bennett Family Partnership has continued the rental of the nursing home properties and the investments with FSB.

## OPINION

Respondent has determined that, pursuant to sections 674 and 675(3), petitioners are taxable as owners of the trust.[11] Because respondent's principal argument is that section 675(3) is applicable to tax the petitioners, we will address that issue first.

Respondent contends that the loans from the trust to Bennett & Sons (both the partnership and the corporation) were direct or indirect loans to the grantors and that, since such loans were not repaid as of January 1, 1973, and January 1, 1974 (the beginning of the taxable years at issue),[12] petitioners should be taxed as owners of the entire trust. Petitioners argue that the loans made to the corporation or the partnership were not direct or indirect loans to the grantors.[13] Alternatively, petitioners argue that, if they are taxable under section 675(3), they should be treated as owners of only 30.77 percent of the trust for 1973 and 26.62 percent of the trust for 1974, the percentage which the amount loaned to Bennett & Sons bore to the value of the entire trust corpus at the beginning of the respective taxable years.

Section 675 provides in pertinent part:

The grantor shall be treated as the owner of any portion of a trust in respect of which—

---

[11]Respondent has not asserted that we should disregard the trust as lacking economic reality. See, e.g., *Markosian v. Commissioner*, 73 T.C. 1235 (1980); *Furman v. Commissioner*, 45 T.C. 360 (1966), affd. 381 F.2d 22 (5th Cir. 1967).

[12]The taxable years of the grantors, the trust, the beneficiaries, and Bennett & Sons (both the partnership and the corporation) were all calendar years.

[13]We note that, because the loans were not "made by a trustee other than the grantor and other than a related or subordinate party," petitioners do not fall within the sec. 675(3) exception. See sec. 672(c) for the definition of a related or subordinate party. Furthermore, it appears that the loans were unsecured.

\*     \*     \*     \*     \*    ˎ\*     \*

(3) BORROWING OF THE TRUST FUNDS.—The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The preceding sentence shall not apply to a loan which provides for adequate interest and adequate security, if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.

In *Buehner v. Commissioner*, 65 T.C. 723, 741–742 (1976), we held that a loan to a corporation was not a direct or an indirect loan to the grantor-shareholder within the meaning of section 675(3).[14] Respondent does not ask us to overrule *Buehner* but rather argues that the loans to the corporation (OBC) in *Buehner* were distinguishable from those made to the corporation in the instant case because the loans in *Buehner* were secured. But the loans in *Buehner* were not collateralized until after the years in issue and, in any event, the fact of collateralization is irrelevant where a related or subordinate trustee is involved (as was the case in *Buehner* ) and does not appear to have been a material element of our rationale therein. We have carefully reviewed the facts of the instant case and those of *Buehner* and find no significant distinctions between the loan made to Bennett & Sons, Inc., and those made to the corporation in *Buehner*, including the fact that the corporation in *Buehner* had "been in active existence for many years" (65 T.C. at 742) while Bennett & Sons, Inc., was a newly formed corporation. Accordingly, on the authority of *Buehner*, we hold that the $20,000 loan to Bennett & Sons, Inc., was not a direct or an indirect loan to the grantors within the meaning of section 675(3).[15]

Bennett & Sons partnership had borrowed, and had not repaid by January 1, 1973, and January 1, 1974, loans totaling $426,000. The parties' dispute revolves around whether these loans represent trust funds directly or indirectly borrowed by

---

[14]In *Buehner v. Commissioner*, 65 T.C. 723, 727 (1976), the grantor owned 419.46 of the 419.56 shares of voting stock in the corporation during the years before the Court. The remaining .1 share was held by the grantor's brother.

[15]Respondent's briefs are unclear as to whether he takes the position that the certificates of deposit and the participation loans invested in by the trust constitute money loaned by the trust to a controlled corporation (FSB) of the grantors. Assuming that respondent is urging that viewpoint, we conclude that on the authority of *Buehner* such "loans" are not direct or indirect borrowings by the grantors.

the grantors. Initially, we note that neither section 675 nor the regulations thereunder provide any guidance as to whether money borrowed by a partnership is borrowed directly or indirectly by the grantor-partners.[16]

The question of whether a partnership should be considered as a legal entity distinct from its partners or rather as a mere aggregation of its partners has engendered much as yet unresolved debate. As a result, for both tax and nontax purposes, a partnership is treated as a hybrid creature. See generally 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners par. 1.102, at 1–5 to 1–7 (1977); J. Crane & A. Bromberg, Law of Partnership 16–29 (1968). Accordingly, while some features of partnership law may provide a basis for the proposition that money borrowed by a partnership is not borrowed by its partners,[17] other factors support the conclusion that a loan to a partnership is a loan to its individual partners. Thus, for example, a general partner is liable for the entire amount loaned the partnership, not merely a portion of such debt. J. Crane & A. Bromberg, *supra* at 335–336. Additionally, with respect to outside creditors, the individual property of each partner is as much liable for firm debts as is partnership property. J. Crane & A. Bromberg, *supra* at 342. Moreover, while borrowings by a corporation do not affect a shareholder's basis in his stock, partnership borrowings may increase a partner's basis in his partnership interest (see sec. 752(a)), and thus increase the amount of partnership losses which a partner may deduct (see sec. 704(d)). Additionally, interest paid by a partnership "flows through" the partnership and is deducted on a partner's individual return. See sec. 702.

Furthermore, in resolving the issue before us, we are

---

[16]Compare sec. 1.267(b)–1, Income Tax Regs., which provides that, for purposes of sec. 267, a transaction between a partnership and a third party other than a partner shall be considered as occurring between the third party and the individual members of the partnership. See *Casel v. Commissioner*, 79 T.C. 424 (1982).

[17]For example, although a partner has a right to possess partnership property for *partnership* purposes, he has no right to use such property for nonpartnership purposes without the consent of his partners. Uniform Partnership Act sec. 21. Similarly, a partner holds as a trustee any profits derived by him without the consent of the other partners from any transaction connected with the conduct of the partnership or from any use by him of its property. Uniform Partnership Act sec. 25.

satisfied that we should not confine our analysis to "the jurisprudential aspects of so-called legal 'entities'" and "overlook the real meaning and purpose of [the statutory provisions at issue]." See *Commissioner v. Whitney*, 169 F.2d 562, 565 (2d Cir. 1948), affg. in part, revg. and remanding in part 8 T.C. 1019 (1947). Congress enacted sections 671 through 678 in an effort to "[provide] rules to determine when a trust's income is to be taxed to the grantor because of the grantor's substantial dominion and control of the trust property or income." S. Rept. 1622, 83d Cong., 2d Sess. 86 (1954); H. Rept. 1337, 83d Cong., 2d Sess. 63 (1954). Thus, in determining whether the grantors have borrowed directly or indirectly from a trust, within the meaning of section 675(3), we should take into account what the borrowing represents in terms of the grantors' dominion and control over the trust. Cf. *Benson v. Commissioner*, 76 T.C. 1040, 1045 (1981).

The three Bennetts, each one-third partners in Bennett & Sons, transferred partnership property (the nursing homes) to the trust. Subsequently, the partnership borrowed money from the trust to meet operating expenses and for use as working capital. The partnership and its grantor-partners had the same use of the borrowed money as they had of the income generated by the nursing homes prior to their transfer to the trust.[18] Although an individual grantor was not free to use the borrowed money for nonpartnership purposes without the consent of his partners, this restraint was no different than that which existed in respect of the partnership property prior to its conveyance to the trust.

We think it immaterial that the loans were made to the partnership while the grantors were the individual Bennetts. Section 675(3) taxes the grantors when they have borrowed trust funds either directly or *indirectly.* Thus, even if the loans to the partnership were not direct loans to the grantors, under the facts of this case, we think it clear that they were at least indirect loans to the grantors.

In this connection, we note that the three Bennetts were

---

[18]We recognize that some money was distributed by the trustees to enable the beneficiaries to pay their taxes. While these distributions arguably may be a factor to consider in determining what portion of the trust income is taxable to the grantors (see pp. 481–486 *infra*), we believe these distributions are immaterial in the determination of whether trust funds were borrowed by the grantors within the meaning of sec. 675(3).

general partners, two of them were trustees, all of them acquiesced in the loans, and partnership property constituted the bulk, if not all, of the original corpus of the trust. We leave for other cases, where the foregoing circumstances do not exist, the resolution of the extent to which a limited or general partner-grantor is taxable under section 675(3).

We conclude that, because they borrowed money from the trust and had not completely repaid those loans before the beginning of the taxable years at issue,[19] petitioners are treated as owners of the "portion of the trust in respect of which" they have borrowed. See sec. 675(3).

We must now resolve whether, as respondent contends, petitioners are taxable as owners of the entire trust or, as petitioners contend, as owners of only a portion of the trust. Section 675(3) treats the grantor as owner "of any portion of a trust in respect of which" the grantor has borrowed the corpus or income and has not completely repaid the loan before the beginning of the taxable year. Respondent argues that petitioners are taxable as owners of the entire trust because their borrowing is indicative of their dominion and control over the entire trust. Petitioners contend that "portion" refers to that part of the trust borrowed in comparison to the value of the entire trust corpus. Accordingly, petitioners maintain that they are taxable as owners of 30.77 percent of the trust for 1973 and 26.62 percent of the trust for 1974—the ratio which the outstanding loans at the beginning of each year bear to the fair market value of the trust assets at the beginning of each year.

In *Benson v. Commissioner*, 76 T.C. at 1047, we specifically rejected the argument made here by petitioners:

> Likewise, we reject petitioners' contention that "portion" refers to the amount borrowed in comparison to the entire trust. Petitioner would have us calculate a fraction arrived at by dividing the amount borrowed by the trust corpus, and treat that fraction as the trust "portion" owned by the grantor. If such were the case, a trust grantor could borrow the entire trust income derived from the entire trust corpus but only be treated as owning a fraction of the trust, even though his borrowing evidences dominion and control over the entire trust. We find such a result patently unreasonable and unsupported by the statutory language or any other authority. [Fn. ref. omitted.]

---

[19]Bennett & Sons partnership was in existence until Jan. 8, 1974, and as of Jan. 1, 1974, had not repaid the loans to the trust.

In *Benson*, the trust had income and expenses as follows (76 T.C. at 1042):

| Year | Income | Taxes and depreciation | Net income |
|------|--------|------------------------|------------|
| 1973 | $22,150 | $8,113 | $14,037 |
| 1974 | 20,400 | 3,619 | 16,781 |
| 1975 | 20,400 | 3,724 | 16,676 |
| | 62,950 | 15,456 | 47,494 |

The grantor had outstanding loans from the trust in the following amounts (76 T.C. at 1042):

| Date | Principal | Interest | Total |
|------|-----------|----------|-------|
| Jan. 1, 1974 | $17,215 | $916.87 | $18,131.87 |
| Jan. 1, 1975 | 47,712 | 2,782.06 | 50,497.06 |

No distributions of income were made to the beneficiaries (76 T.C. at 1043). Because the grantor in *Benson* had "borrowed all the trust income and that income was derived from the entire trust corpus" (76 T.C. at 1047–1048), we held that he "should be treated as owner of the entire trust" (76 T.C. at 1048).

The facts of the instant case are different from those of *Benson*. The grantors did not borrow all of the trust income; in each year, distributions were made to each of the beneficiaries to enable them to pay their taxes. Additionally, some of the trust income was invested in participation loans and certificates of deposit. Thus, we are faced with the question we left open in *Benson v. Commissioner* (76 T.C. at 1047–1048): What is the "portion of a trust in respect of which" the grantor has borrowed, when some, but not all, of the trust income is borrowed?

Respondent argues that petitioners should be taxed on the entire trust income on the theory that their borrowing of some of the trust income represents their dominion and control over the entire income. Possible support for respondent's position may be found in the *Clifford* regulations in effect prior to the 1954 Code. Section 29.22(a)–21(e) (Regs. 111)[20] of the *Clifford* regulations provided that:

Income of a trust * * * is taxable to the grantor where, under the terms of

---

[20]See 1946–1 C.B. 19, 22.

the trust or the circumstances attendant on its operation, administrative control is exercisable primarily for the benefit of the grantor rather than the beneficiaries of the trust. Administrative control is exercisable primarily for the benefit of the grantor where—

*   *   *   *   *   *   *

(3) a power exercisable in a fiduciary capacity by a person other than the grantor or spouse living with the grantor enables the grantor to borrow such corpus or income, directly or indirectly, and such power has been exercised and the grantor has not completely repaid the loan, including any interest, before the beginning of the taxable year * * * [21]

The regulation can be read as taxing the grantor on *all* of the trust income whenever he borrows *any* of the income or corpus. See 3 B. Bittker, Federal Taxation of Income, Estates and Gifts par. 80.7, at 80–61 n. 10. But see *Holdeen v. Commissioner*, T.C. Memo. 1975–29 (text at n. 11).

The 1954 Code "generally adopt[ed] the approach of the [*Clifford*] regulations * * * but with important modifications." S. Rept. 1622, 83d Cong., 2d Sess. 86 (1954); H. Rept. 1337, 83d Cong., 2d Sess. 63 (1954). The legislative history of section 675 states that "This section corresponds to section 29.22(a)–21(e) of the regulations[;] * * * [sec. 675(3)] corresponding to subsection (e)(1)(iii)-of the regulations, subjects the grantor to tax if he has directly or indirectly borrowed the corpus or income and has not completely repaid the loan (including interest) before the beginning of the taxable year." S. Rept. 1622, *supra* at 369–370; H. Rept. 1337, *supra* at A216. We do not interpret this legislative history as indicating that if, under the *Clifford* regulations, the entire income was attributable to the grantor upon his borrowing any income, the same should be the result under the 1954 Code. The 1954 Code introduced the concept of a "portion" of the trust. For example, whatever the result under the *Clifford* regulations, under the 1954 Code, if the grantor has the power to borrow only ordinary income without adequate interest and security (see sec. 1.671–1(b), Income Tax Regs.), he is taxed only on ordinary income and not on income attributable to corpus. See

---

[21]Sec. 29.22(a)–21(e)(2), Regs. 111, taxed the grantor on the trust income where a power exercisable by the grantor or his spouse enabled the grantor to borrow trust income or corpus whether with or without adequate security or interest. The *Clifford* regulations do not seem to cover the situation where the trustee is the grantor or the grantor's spouse and, although the trust instrument prohibits the grantor from borrowing from the trust, the grantor does, in fact, borrow trust income or corpus.

sec. 675(2); sec. 1.671–3(b)(1), Income Tax Regs. Thus, when the grantor is taxed because of a power, the language of the trust instrument will generally determine over what portion of the trust the power may be exercised and, therefore, the portion of the trust in respect of which the grantor is treated as the owner. However, unlike the other provisions of section 675 which tax the grantor on *powers* which he has over the trust or portions thereof, section 675(3) taxes the grantor because of *events* (i.e., borrowings). Therefore, in interpreting the words "portion in respect of which" for purposes of section 675(3), we believe our inquiry should take into account what the grantor actually borrowed.[22] Cf. section 1.671–3(c), Income Tax Regs., which recognizes that the grantor is taxed on only a part of the trust income if he has a "power over or right to a dollar amount of ordinary income." We reject respondent's contention that the grantor is taxable on all the trust income whenever he borrows any of such income; such an interpretation would give insufficient weight to the word "portion" in section 675(3). Nor should the grantors be taxable on the entire income for 1973 and 1974 merely because their loans outstanding at the beginning of the taxable years ($426,000) were in excess of those years' income ($167,434.43 and $206,494.69). We do not believe that the fact that the grantors have borrowed a portion of prior years' income necessarily means that they have borrowed "in respect of" the entire income of the current year.[23]

In the instant case, the grantors have borrowed some, but not all, of the trust income in previous years[24] and have made no borrowings in the current taxable year. Under these

---

[22]*Benson v. Commissioner,* 76 T.C. 1040 (1981), holds that the amount borrowed does not per se determine the portion of the trust on which the grantor is taxable but does not stand for the proposition that the amount borrowed is irrelevant in making such a determination. Indeed, we inferred that, in another case, the amount borrowed might be relevant. See 76 T.C. at 1048.

[23]We emphasize that all of the trust income involved herein constituted "ordinary income," i.e., income not allocable to corpus. We leave to another day the question of the extent to which the latter type of income would enter into the calculation of the "portion in respect of which" the grantor of a trust would be taxable under sec. 675(3). As a consequence of the foregoing, all references to trust income herein are to "ordinary income" before distributions to beneficiaries.

[24]Both parties have premised their arguments on the basis that all borrowings were from trust income and there is no convincing evidence of record that cash corpus was available. See *Benson v. Commissioner,* 76 T.C. at 1046 n. 17. See also note 23 *supra.*

circumstances, we conclude that petitioners should be taxed on that portion of the current year's trust income which the total unpaid loans at the beginning of the taxable year bear to the total trust income of prior years plus the trust income for the taxable year at issue.[25] Such an allocation is consistent with the flexible approach articulated in *Benson v. Commissioner*, *supra* (see note 22 *supra*).[26]

The Bennetts had outstanding loans from the trust of $426,000 at January 1, 1973, and January 1, 1974. If the trust's income from its inception through December 31, 1973, was $852,000, the petitioners would be taxable on 50 percent of the trust income for 1973. If, for example, the trust income in 1974 was $94,666, the petitioners would be taxable on 45 percent ($426,000 ÷ ($852,000 + 94,666)) of the trust income for 1974. The parties have stipulated to the outstanding loans at the beginning of 1973 and 1974 and the trust income for those years. The trust income for previous years is not part of the record, but we see no reason why the parties cannot stipulate those amounts of trust income for purposes of the Rule 155 computation.

Having determined that petitioners are taxable on some portion of the trust income pursuant to section 675(3), we now turn to respondent's secondary argument that section 674

---

[25]Such an allocation gives effect, albeit indirectly, to the distributions made to the beneficiaries; such amounts were obviously not borrowed and, therefore, do not enter into the numerator and they also do not reduce the denominator (see note 23 supra). We further note that sec. 675(3) treats unpaid interest as borrowing; in the instant case, interest was in fact fully paid each year.

[26]In *Benson*, we held that, when 100 percent of the current year's income attributable to the entire trust corpus was borrowed, the grantor was taxable on 100 percent of that income. Consistent with that approach, if, in the present case, there had been borrowings in 1973 or 1974, it would appear that the grantors would have been taxed on the portion which the current year's borrowings bear to the current year's income or on the portion which total borrowings bear to total income through the end of the taxable year, *whichever is greater*. On the other side of the coin, the allocation formula we adopt could produce taxability to grantors of an amount of trust income in excess of the amount remaining after distributions to beneficiaries. But this consequence occurs in respect of other provisions dealing with grantor trusts and seems to be mandated by sec. 675(3), which clearly specifies some taxability where there are unpaid borrowings at the beginning of the taxable year. We also note that, at least under the circumstances of this case where all the income constituted "ordinary income," it would appear to make no difference in the computation of the fractional formula we have adopted whether "trust income" is "gross income" or "taxable income" before distributions to the beneficiaries, since each of the petitioners would be entitled to his pro rata share of the deductions properly charged to the trust income. See sec. 671.

operates to tax petitioners as owners of the trust. Section 674(a) provides:

GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party.

Although respondent's arguments are less than models of clarity, we do not understand him to contend that petitioners held a power to affect the beneficial enjoyment of the trust corpus.[27] Rather, we understand respondent's position to be that petitioners had the power to affect the beneficial enjoyment of the trust income because "petitioners in their capacity as trustees, did not follow the terms of the trust agreement to annually pay the entire net income of the trust to the beneficiaries."[28]

Pursuant to the trust instrument, the entire net income of the trust was to be distributed, at least annually, to the beneficiaries in specified shares (i.e., one-sixth to each of Neil's children and one-fourth to each of Wayne's children). See p. 472 *supra*. Petitioners argue that they, or nonadverse parties, did not have the power to affect the beneficial enjoyment of the trust income or corpus; they relinquished power over the trust income by providing in the trust agreement for the annual distribution of the income to the beneficiaries in specified shares. Initially, we note that respondent makes no

---

[27]We note that the trust agreement contains the following provision:

2. Dispositive Provisions. * * *

(d) Notwithstanding anything hereinabove contained to the contrary, if at any time while the trusts herein created are in force any financial emergency arises in the affairs of either of the primary beneficiaries of such trusts, or if the independent income of either of such beneficiaries (exclusive of the income from any trust herein or otherwise created for his or her benefit by the Grantor) and all other means of support are insufficient for the support of such beneficiary, in the judgment of the Trustees, the Trustees shall pay over to such beneficiaries out of the corpus of the trust for his or her benefit, at any time and from time to time, such sum or sums as the Trustees shall deem necessary or appropriate in their absolute discretion.

Respondent does not argue, and accordingly we do not address, the issue of whether this power to distribute corpus is encompassed within the exception to sec. 1.674(b)-1(b)(5), Income Tax Regs.

[28]Were we to accept this theory, Jesse O. Bennett would be taxable despite the fact that he was not a trustee, since any power of disposition would be exercisable by a party not adverse to Jesse O. Bennett. See secs. 674(a) and (c), and 672.

argument, and accordingly we do not address, whether the trustees' failure annually to distribute the income (or their belief that they were operating the trust in accordance with its provisions, see pp. 474–475 *supra*) evidences an implied agreement between the parties to the trust such that, despite the provisions of the written instrument, the petitioners retained a de facto power to affect the beneficial enjoyment of the trust income. Cf. *Estate of Gilman v. Commissioner*, 65 T.C. 296, 306–307 (1975), and cases cited thereat, affd. per curiam 547 F.2d 32 (2d Cir. 1976), to the effect that the retained enjoyment for purposes of the estate tax may be embodied in an implied agreement. For the reasons set forth below, we agree with petitioners that the misadministration of the trust, although possibly subjecting the trustees to liability for a breach of fiduciary duty, does not bring the trust within the purview of section 674.

At the outset, we note that the trust instrument is replete with provisions emphasizing the fiduciary obligations of the trustees to administer its provisions in the interests of the trust and of the beneficiaries. See pp. 472–474 *supra*. In *Matthaei v. Commissioner*, 4 T.C. 1132 (1945), we held that the misadministration of a trust by grantor-trustees did not cause the grantors to be taxable on the income of the trust. See *Cohen v. Commissioner*, 15 T.C. 261, 274–276 (1950); *Fischer v. Commissioner*, 14 T.C. 792, 798–799 (1950). Compare *Estate of Bloch v. Commissioner*, 78 T.C. 850 (1982). While *Matthaei v. Commissioner, supra,* was decided prior to the enactment of section 671 et seq., its principle is still viable. See *Buehner v. Commissioner, supra.*[29] Having executed the trust instrument, the grantors relinquished the power, i.e., the right or the authority, to tamper with the beneficial enjoyment of the trust income. The grantor-trustees' misadministration of the trust is not the equivalent of the authority to dispose of the beneficial enjoyment of the trust income.[30] Although under the facts and circumstances of a particular case, the trustees' misadministration might be evidence of the lack of economic reality of the

---

[29]See also *Query v. Commissioner*, T.C. Memo. 1954–160.

[30]Compare sec. 675(3), which taxes the grantors on the *event* of borrowing rather than the *power* to borrow. See p. 484 *supra*.

trust or the existence of an implied agreement pursuant to which the grantors have retained control over the beneficial enjoyment of the trust income or corpus, respondent does not argue that this is the case here. See note 11 *supra*. Accordingly, petitioners are not taxable on the trust income pursuant to section 674(a).

In accordance with the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

IRWIN, *J.*, dissenting: As the trier of fact, I respectfully dissent from the majority's conclusion that the loans to Bennett & Sons (partnership) constitute direct borrowings from the trust by the grantors within the meaning of section 675(3). Rather, I would hold on the authority of our decision in *Buehner v. Commissioner*, 65 T.C. 723 (1976), that the loans in question are neither direct nor indirect borrowings by the grantors.

The term "indirectly," as used in section 675(3), is not defined in the *Clifford* regulations[1] or in any of the committee reports on subpart E.[2] Section 1.675–1, Income Tax Regs., does not elaborate on "indirectly." However, section 1.675–1(a), Income Tax Regs., does characterize the provisions of section 675 as providing:

in effect that the grantor is treated as the owner of any portion of a trust if under the terms of the trust instrument or circumstances attendant on its operation administrative control is exercisable *primarily for the benefit of the grantor* rather than the beneficiaries of the trust. * * * [Emphasis added.]

In *Buehner* we looked to the bona fides of the loans and the identity of the borrower. There was no evidence therein that the loans were "indirectly diverted" for the grantor's benefit.[3]

---

[1] See sec. 29.22(a)–21(e), Regs. 111; sec. 39.22(a)–21(e), Regs. 118.

[2] See H. Rept. 1337, 83d Cong., 2d Sess. A216 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 369–370 (1954).

[3] In *Buehner* we stated:

"The debt in question is reflected by [the corporation] on its financial statements. The

Similarly, in the present case the loans were bona fide, carried market rate interest, and were in no way diverted for petitioners' benefit.

I am mindful that the loans in *Buehner* were made to a corporation while the loans herein were made to a general partnership. As pointed out by the majority, two tax differences could result from this distinction. Borrowing by a general partnership may benefit the partners by increasing the basis of each partner's partnership interest (see sec. 752(a)), and thus possibly lessening the effect of the limitation on allowance of partnership losses provided in section 704(d). Additionally, interest paid by the partnership "flows through" to the partner's benefit. See sec. 702(a). Generally, these benefits, which are distinctive to a partnership, would arise from borrowed funds regardless of the source of such funds. Bennett & Sons operated profitably during these years, thus section 704(d) did not apply to petitioners. Although petitioners did individually receive some benefit resulting from the interest paid by Bennett & Sons to the trust, this benefit would have been obtained from loans for operating capital regardless of the source of the loans. The loans herein carried interest at prevailing rates and were repaid in full prior to termination of the trust. Petitioners herein acted in their fiduciary capacity as trustees in loaning trust funds to Bennett & Sons, not as members of the partnership.[4] On these facts, I would hold that these loans were not made directly or indirectly to the grantors within the meaning of section 675(3).

I must also protest the majority's gratuitous comment that "under the facts and circumstances of a particular case, the trustees' misadministration might be evidence of * * * the existence of an implied agreement pursuant to which the grantors have retained control over the beneficial enjoyment of the trust or corpus" within the meaning of section 674(a).

---

funds acquired were used by [the corporation] for internal corporate purposes. There is no indication that any of these funds were indirectly diverted for petitioner's benefit. Certainly, as a shareholder, petitioner received a benefit from this loan but not to any degree greater than the benefit that accrued to the other shareholders, creditors, and employees of [the corporation]. [*Buehner v. Commissioner*, 65 T.C. 723, 742.]"

[4]Cf. sec. 707(a) which reflects the entity concept of partnerships by providing that for purposes of subch. K "If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall * * * be considered as occurring between the partnership and one who is not a partner."

490

This Court has never addressed the issue of whether an implied agreement can constitute a power of disposition under 674(a). The issue is not raised here. Therefore we should not decide it.