BRUCE GOLDBERG, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BRUCE GOLDBERG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bruce Goldberg, Inc. v. Commissioner
Docket Nos. 39411-86; 39412-86[1]
United States Tax Court
T.C. Memo 1989-582; 1989 Tax Ct. Memo LEXIS 591; 58 T.C.M. (CCH) 519; T.C.M. (RIA) 89582; October 30, 1989
Bruce Goldberg, pro se and as an officer of petitioner, Bruce Goldberg, Inc. Sandra M. Gilmore, for the respondent. WELLS
*594 MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in and additions to tax as follows: Additions to Tax Petitioner
Year
Deficiency
Under Section 6653(b) [2]
Bruce Goldberg
1981
$ 11,487.36
$ 5,743.68
1982
12,070.53
* 6,035.27
1983
10,944.41
* 5,472.21 Fiscal Year
Additions to Tax
Petitioner
Ending
Deficiency
Under Section 6653(b)
Bruce Goldberg,
July 31, 1982
$   533.57
* $   266.78
Inc.
July 31, 1983
9,440.31 [3]
* 4,720.16
*595 After concessions, in addition to two preliminary matters involving the admissibility of certain documents and a motion by respondent to amend his answer, the issues remaining for our consideration are: (1) whether petitioners are liable for the additions to tax for fraud under section 6653(b) for the taxable years in issue; (2) whether the assessment and collection of taxes and additions to tax for the taxable years 1981 and 1982 are barred by the period of limitations; (3) whether certain amounts conceded by petitioner Bruce Goldberg to be nondeductible as "charitable contributions" to the Universal Life Church are properly deductible under other provisions of the Internal Revenue Code, and (4) whether petitioner Bruce Goldberg, Inc. failed to report certain interest income and failed to substantiate its entitlement to deductions in excess of respondent's determinations. PRELIMINARY MATTERS Evidentiary Objections to ULC Documents. Respondent has objected to the admission into evidence of various documents upon which petitioner Bruce Goldberg [4] claims he relied in setting up and operating a local charter of the Universal Life Church ("ULC"). Petitioner asserts that the *596 documents are relevant to motive and thus relevant to the question of fraud. Respondent objected on the grounds of "hearsay and relevancy" to the admission of an April 30, 1976 edition of a newsletter called "The Modesto Bee" and to the admission of seven unsigned and undated documents entitled "Free," "Church," Congregation," "Questions and Answers," "Information Monthly," "Minister" and "Become a Minister and Start a Tax Exempt Church." We find that those documents are admissible insofar as they relate to petitioner's motive or intent in setting up and operating a local charter of the ULC. Having conceded the issue of the deductibility of contributions to his local charter, petitioner apparently did not offer these documents, which primarily contain propaganda about such charters, to prove the truth of the matters contained therein. Because the documents are being offered solely for the purpose of evaluating petitioner's intent, respondent's hearsay objection *597 will be denied. See Rule 801(c), Federal Rules of Evidence ("FRE") (definition of hearsay). We similarly find the documents to be relevant to petitioner's motive and intent as they relate to the issue of fraud, discussed infra. FRE Rule 401. [5]
Respondent objected to the admission of a document entitled "Instruction for Annual Receipt of Contributions" on the grounds of relevancy, hearsay, and also authenticity. As in the case of the other documents offered by petitioner, respondent's hearsay objection is misplaced, as the document was not offered to prove the truth of the matters contained therein. FRE Rule 801(c). We also find the document in question, *598 which contains instructions from ULC headquarters in Modesto, California ("ULC Modesto") on how to proceed in the event of an Internal Revenue Service audit, relevant to petitioner's motive and intent as they relate to the issue of fraud. FRE Rule 401. With respect to respondent's authenticity objection, we find petitioner's testimony sufficient to authenticate the document under FRE Rule 901(b)(1). The authenticity of the document in question is also supported by its content, taken in conjunction with the circumstances. FRE Rule 901(b)(4). We do not address respondent's evidentiary objections concerning certain other documents, as the admissibility of such documents would have no bearing on our conclusions.
Respondent's Motion to Amend Answer. Respondent concedes that, unless fraud is proven, the period of limitations bars the assessment and collection of tax with respect to petitioner's 1981 taxable year and with respect to the corporation's fiscal year ending July 31, 1982. Respondent moved at the conclusion of trial to amend his answer pursuant to Rule 41(b)(2) *599 to assert that the period of limitations with respect to petitioner's 1982 taxable year was extended under section 7609(e), and is therefore open even absent proof of fraud. Respondent submitted that motion in writing, along with an amended answer, approximately four months after the conclusion of trial. For the reasons discussed below, respondent's motion will be denied. On March 6, 1984, during the audit of petitioners, respondent's agents served summonses on various financial institutions to obtain the bank records of petitioners and of the ULC charter controlled by petitioner. On March 22, 1984, petitioner on behalf of himself and the corporation filed a petition to quash the summonses in the U.S. District Court for the District of Maryland. On May 31, 1984, the United States District Court entered an Order and Memorandum denying the petition to quash the summonses and granting the government's motion for summary judgment. This case was reported as Goldberg v. Commissioner, 586 F.Supp. 92 (D. Md. 1984). Section 7609(e) in general terms provides for a suspension of the period of limitations under section 6501 if a taxpayer files a petition to quash a summons *600 of his bank or other financial records. Despite the applicability of the section 7609(e) extension to the instant case, respondent's answers to the petitions filed herein made no mention of that provision. The only extension provision properly raised by respondent in his answers was the provision in section 6501(c)(1) relating to fraud. At a hearing held three days prior to the commencement of the trial of the instant case, respondent brought to this Court's attention petitioner's refusal to stipulate to facts related to the summons enforcement proceedings. Petitioner's response was that he had refused to stipulate to these facts because this Court had already ruled, in a pretrial motion, to deny respondent's motion to suspend the statute of limitations under section 7609(e). [6] Petitioner further stated that "Filing the petition to quash is not a badge of fraud. It's simply a taxpayer's right as an American citizen. * * * I would be happy to consider it but I have no way of knowing how it could possibly be a relevant issue." Respondent at that time specifically stated that the purpose of offering the facts related to the summons enforcement was."To show the taxpayer's lack *601 of cooperation during the audit." The Court concluded the discussion of this matter by stating that "[the summons enforcement proceedings] are a matter of public record and you may retain your relevance objection. It may be placed in the stipulation with your relevance objection." Respondent's trial memorandum made no mention of the issue related to section 7609(e), and respondent's opening statement at trial ended as follows: As Your Honor knows, the Government does have a Statute of Limitations problem. Unless the Government proves fraud for the 1981 year and the 1982 year as to the individual, and for the corporation as to the fiscal year ending July 31, 1982, all the assessments are barred by the Statute of Limitations. That concludes my opening remarks. [Emphasis supplied] Notwithstanding the above-quoted remarks, respondent moved at the conclusion of trial to *602 "conform the pleadings to the proof" to allege that the period of limitations was open under section 7609(e) with respect to petitioner's 1982 taxable year. Petitioner again asserted that a pretrial motion on this issue had already been denied by this Court. In response to this Court's inquiry about whether there was evidence in the record on the issue related to section 7609(e), respondent stated that the facts related to the summons enforcement proceedings had been stipulated. The Court then determined that it would rule on respondent's motion to conform in its final opinion. The Stipulation of Facts submitted by the parties contained information related to the summons enforcement proceedings, but failed to mention petitioner's prior relevancy objection. The parties filed seriatim briefs in this case. In his opening brief, respondent argued that the amendment to his answer should be allowed because, "As indicated in the post-trial discussions on the record," petitioner was "advised" prior to trial of respondent's intention to raise the issue related to section 7609(e), and because the period of limitations, generally, was not a new issue in the case. Petitioner asserted again *603 in his answering brief that this Court had already denied respondent's motion concerning section 7609(e) in a pretrial conference call. The brief further argued that respondent had failed to submit the motion in writing as requested by the Court, and that petitioner would be prejudiced by this Court's allowance of the amendment. Respondent's reply brief reiterates the fact that petitioner was "aware" of respondent's intention to raise the issue related to section 7609(e) prior to trial, and states that because the summons enforcement proceeding is a matter of public record, this Court could take judicial notice of such proceeding without the necessity of respondent's amending his answer. The brief also argues that because the summons enforcement facts were stipulated and are a matter of public record, no undue surprise or prejudice to petitioner would result from respondent's raising the issue concerning section 7609(e). Respondent's written "Motion for Leave to File Amendments to Answers to Conform the Pleadings to the Proof" proffers the same arguments for amendment made at trial and on brief. Rule 41(b)(2), [7] relied upon by respondent in his motion to amend, provides that *604 this Court may allow amendments to the pleadings to conform them to the evidence when "justice so requires" and when the party objecting to the admission of evidence on the ground that it is not within the issues raised by the pleadings "fails to satisfy the Court that the admission of such evidence would prejudice him in maintaining his position on the merits." It is well established that the allowance of amendments to pleadings is a matter within the sound discretion of the Court. Commissioner v. Long's Estate, 304 F.2d 136 (9th Cir. 1962), affg. unreported orders of this Court; Law v. Commissioner, 84 T.C. 985, 990 (1985). In the instant case, we find that the conditions specified in Rule 41(b)(2) for amendment of pleadings have not been met, and that respondent's motion to amend must therefore be denied. Although petitioner's "relevancy" objection was not specified in the written Stipulation of Facts submitted to this Court, we find petitioner's statements at the close of trial sufficient to *605 preserve his objection to the admission of the summons enforcement evidence to prove a suspension of the period of limitations. Petitioners' brief, moreover, argues that section 7609(e) should not be an issue in the case because it was not raised in respondent's answer. Accordingly, we find that petitioner objected to the admission of the summons enforcement evidence on the ground that it was "not within the issues raised by the pleadings," to the extent that respondent offered such evidence for the purpose of proving an extension of the period of limitations under Rule 41(b)(2). Turning to the conditions specified in Rule 41(b)(2) for amendment of answers, we find that justice would not be served by admitting the evidence of the summons enforcement proceeding for the purpose of proving an exception to the general period of limitations. We therefore hold that the evidence of the summons enforcement proceeding is admissible only for the limited purpose of establishing fraud, as offered by respondent at the pretrial hearing. FRE Rule 105. Respondent's own statement at the pretrial hearing as well as his opening statement at trial could reasonably *606 have led petitioner to believe that section 7609(e) was not an issue in the instant case. Those statements by respondent negate a finding of "fair warning" even if respondent's intention to rely on section 7609(e) was, at some earlier time, made known to petitioner. Estate of Mandels v. Commissioner , 64 T.C. 61, 73 (1975); cf. William Bryen Co. v. Commissioner, 89 T.C. 689, 707 (1987). Instead of raising the section 7609(e) issue at the commencement of trial, respondent did virtually the opposite, and now is too late for respondent to compensate for his neglect or inadvertence or to simply change his strategy. See Kramer v. Commissioner, 89 T.C. 1081, 1083-1086 (1987). We also find that allowing the amendment requested by respondent would result in prejudice to petitioner, who presented his case on the assumption that the assessment of tax for his taxable year 1982 would be barred absent proof of fraud. Had petitioner been aware that the period of limitations for his 1982 taxable year was open under section 7609(e), he might have devoted more time at trial to substantiating the deductibility of certain amounts paid during that *607 year rather than concentrating so much of his effort at trial on the subjective evidence of intent. Respondent's motion to amend his answer will therefore be denied. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner resided in Baltimore, Maryland, at the time he filed his petition in the instant case. The corporation was during the taxable years in issue and at the time it filed its petition in the instant case a Maryland corporation having its principal place of business in Baltimore, Maryland. Petitioner was the sole shareholder, officer, director, and full-time employee of the corporation during all taxable years in issue. The corporation was formed on June 23, 1980. Petitioner was engaged in two distinct professions during the taxable years in issue -- dentistry and hypnosis. His unique career combination and involvement with "past-life regression" and "future-life progression" (about which he published a book, "Past Lives, Future Lives," in 1982) made him the subject of newspaper articles in cities such as Boston, San Diego, and Pittsburgh *608 during 1982 and 1983. Petitioner toured the country promoting his book, hosted a radio show dealing with parapsychology, and made various television appearances on this subject during the years in question. Petitioner graduated magna cum laude from Southern Connecticut State College, received a dental degree from the University of Maryland, and received a Master's Degree in counseling psychology in 1984. He maintained numerous bank and other financial accounts in his own name and in the corporation's name. Petitioner's dental practice was operated as a sole proprietorship, with income and expenses reported on Schedule C, Form 1040. Petitioner did not operate his dental practice at his residence but rented outside office space from another dentist and later purchased that dentist's practice. Petitioner engaged in his hypnosis practice as an employee of the corporation, which operated out of petitioner's home. In that regard, a written 10-year lease calling for the payment of rent in the amount of $ 200 per month by the corporation to petitioner (subject to yearly cost of living allowances) was entered into in 1980. Petitioner did not, however, report any rental income on his *609 1982 or 1983 returns, and did not include a Schedule E with either return. The rent to be paid by the corporation under the lease was determined at a special meeting of the directors of the corporation attended solely by petitioner. A schedule appended to the minutes of that meeting shows that the rent was calculated by multiplying the sum of the mortgage interest, maintenance and utility costs of the residence by the percentage of the residence (in square footage) to be used by the corporation (27 percent). On his 1981 return (the only return in question which included rental income or expense), petitioner reported $ 1,600 in rental income and $ 3,146 in related expenses and depreciation, and claimed a deduction of $ 1,546 for losses from rental activities. Petitioner kept the books and records and prepared the income tax returns for the corporation, which reported income and deductions on the cash basis. Petitioner had never prepared corporate income tax returns before preparing the corporation's return for its first taxable year and had no business training. Although the corporation was engaged in a service business (with cassette tapes and books being the only items that *610 might be classified as "inventory"), its return for the fiscal year ending July 31, 1982 included a "cost of goods sold" adjustment of $ 40,797.36 (line 2 of the return), which was deducted from gross receipts of $ 82,105.36. The same return, however, contained a prominent, oversized "zero" in the part of Schedule A which is used to calculate the "cost of goods sold" reported on line 2, and the return did not separately state deductions for charitable contributions, repairs, bad debts, or miscellaneous "other deductions." The corporation's return for the fiscal year ending July 31, 1983, did not include a "cost of goods sold" adjustment, but claimed $ 41,996.02 in miscellaneous "other deductions" (line 26 of the return) which figure included items (such as charitable contributions, taxes, and repairs) that should have been separately stated on other lines of the return. In auditing the corporation's return for the fiscal year ending July 31, 1983, the revenue agent assigned to petitioners' case analyzed the deductibility of each category of items improperly lumped together on the return as "other deductions." In 1980, petitioner selected Mr. John Rosenberger, C.P.A., as his accountant. *611 Mr. Rosenberger had been a certified public accountant for approximately 7 years at that time. Mr. Rosenberger prepared petitioner's 1980 personal income tax return. Petitioner contacted Mr. Rosenberger in the fall of 1981 concerning the possibility of setting up a local charter of the ULC. In this connection, petitioner supplied Mr. Rosenberger with various documents containing information and propaganda about the ULC and the tax advantages enjoyed by churches in general. One of these documents contained the statement: All church organizations that derive their tax exempt status by using the federal and state identification numbers that were assigned the Universal Life Church, Inc., ARE IN FACT part of the Universal Life Church, Inc. Each individual Universal Life Congregation is considered an integral part of the Universal Life Church, Inc. * * * The legal name of all Universal Life congregations is "THE UNIVERSAL LIFE CHURCH, INC." At the time that petitioner supplied this document to Mr. Rosenberger, ULC Modesto was in fact recognized as tax exempt by the Internal Revenue Service. [8]
*612 Apart from verifying the exempt status of ULC Modesto and reviewing the information supplied to him by petitioner, Mr. Rosenberger did not acquire any knowledge about the ULC versus any other church organization. Mr. Rosenberger's review of the information provided to him by petitioner indicated that, if petitioner's church were part of the Modesto organization, it could fall within their exempt grouping. Mr. Rosenberger advised petitioner primarily about the requirements and tax consequences of church status in general, including the need for minutes, a charter, and bylaws, and the availability of a parsonage and food allowance. Mr. Rosenberger prepared petitioner's 1981, 1982, and 1983 Federal income tax returns (Form 1040). In preparing tax returns for his clients, Mr. Rosenberger's general practice was not to examine his clients' backup documentation (e.g., cancelled checks), but merely to ask the clients whether backup documentation existed if a particular item appeared "out of line." Petitioner executed a ULC "Congregation Agreement" dated November 3, 1981, in which he was designated as "pastor" of a ULC congregation headquartered at his residence. That preprinted agreement *613 required the signatures of three persons over the age of 18 and required the congregation being formed to have a governing body of at least three people -- pastor, secretary and treasurer. Petitioner then received a certificate from ULC Modesto stating that a congregation headquartered at petitioner's residence was started on November 3, 1981 and designating the congregation as "Charter No. 48821." The certificate bore the signature of "Bishop" Kirby J. Hensley, the ULC seal, and the inscription "IRS No. DO 94 EIN 94-1599959," an apparent reference to the Employer I.D. Number (for tax purposes) of ULC Modesto. The certificate also stated that "By this agreement, the Universal Life Church, Inc. authorizes this chartered congregation to open a bank account, or accounts with any other financial institutions, in the name of the Universal Life Church, Inc." Petitioner also received a certificate purporting to ordain him as a minister. On or about December 4, 1981, petitioner met in his home with his girlfriend, Michele Lawton ("Ms. Lawton"), and his secretary and former dental assistant, Denise Tyler ("Ms. Tyler"). At the meeting, Ms. Lawton and Ms. Tyler signed, at petitioner's request, *614 certain documents related to the initial formation and organization of petitioner's local charter of the ULC. Petitioner informed Ms. Tyler that he had checked with his accountant and lawyer and that the ULC was legal. One of the documents signed by Ms. Lawton referred to the adoption of bylaws for the charter (referred to therein as the "corporation") and authorized the treasurer of the corporation to open a bank account with First National Bank of Maryland and "to pay all charges and expenses incident to or arising out of the organization of the corporation." That document designated Ms. Tyler as Treasurer and Ms. Lawton as Secretary, unlike the "Congregation Agreement" which designated Ms. Lawton as Treasurer. Four financial accounts were opened for petitioner's local charter of the ULC. As authorized in the charter's organizational documents, one of those accounts was located at the First National Bank of Maryland (the "First National" account). The checks from the First National account bore the name "Universal Life Church, Inc." and petitioner's home address. Petitioner, Ms. Lawton, Ms. Tyler, and Ms. Lawton's sister had signatory power with respect to the First National *615 account. The other three ULC accounts were a Kemper Money Market Fund account and two Legg Mason accounts with respect to which only petitioner had signatory power. The First National account was opened on December 11, 1981 with a $ 10,000 deposit of funds from one of petitioner's personal financial accounts. Several days later, a second deposit of approximately $ 3,000 was made to the First National account with funds from the same financial account. On his 1981 Federal income tax return, petitioner claimed a charitable contribution deduction of $ 13,250 attributable to amounts "paid" to the ULC. Through an oversight by Mr. Rosenberger, the 1981 return failed to name the recipient of the contribution. In 1982 and 1983, petitioner again claimed charitable contribution deductions -- of $ 30,289 and $ 25,000, respectively -- for amounts transferred to his ULC charter accounts. [9] Petitioner's 1982 and 1983 returns named the recipient of those "contributions" as "Universal Life Church." The corporation also claimed a $ 4,000 deduction on its return for the fiscal year ending July 31, 1983 attributable to amounts transferred to ULC Charter 48821. The recipient was not named on *616 that return, which lumped the charitable contribution deduction together with "other deductions" on line 26 of the return rather than separately stating such deduction. [10] Petitioners have conceded that none of the amounts transferred to petitioner's local ULC charter and claimed as charitable contribution deductions are properly deductible as charitable contributions. Although the corporation transferred $ 14,000 to one or more ULC accounts during its fiscal year ending July 31, 1982, its return for that period (which included the "cost of goods sold" adjustment discussed above) did not on its face claim any deduction for charitable contributions. The funds transferred to the First National Account and deducted by petitioner and the corporation as charitable contributions were used primarily to pay the personal living expenses of petitioner and of Ms. *617 Lawton, and the maintenance costs of petitioner's residence located at 4708 Beaconsfield Drive, Baltimore, Maryland; numerous checks were written on this account to payees such as Giant Food, the Pet Experience, Safeway, Playboy, Abbey Animal Hospital and Dr. Didolkar (Ms. Lawton's gynecologist). The majority of those checks bore the signature of Ms. Lawton, who resided with petitioner from January 1982 until October 1983, or Ms. Tyler, who worked for petitioner until June 1982. At petitioner's urging, Ms. Lawton signed numerous ULC checks in blank, and Ms. Tyler signed ULC checks on which petitioner had already filled in the dates and payees. Petitioner filled in the dates and payees on the checks executed in blank. Various documents received by petitioner from ULC Modesto described the tax advantages of having a local ULC charter pay the living expenses of its "pastor" and stated that the ULC was "legal" in every state in the United States. [11]ULC "Information Monthly" received by petitioner stated (as part of a description of the financial policy of the church as of February, 1981) that: It is best if the Pastor does not handle any of the church's funds or sign checks upon *618 the church's accounts -- especially expenses that have to do with him personally. It is not illegal for the Pastor to sign upon the church's accounts -- it only looks unfavorable. Yes, the Pastor may be a signer upon the account, but he should refrain from signing. In accordance with instructions from ULC Modesto, petitioner completed preprinted monthly and quarterly reports detailing the income and expenses of his local charter. Those reports were signed by Ms. Lawton or Ms. Tyler and were submitted to ULC Modesto along with the required fees for "bookkeeping" services. The bylaws of ULC Charter 48821 included among the duties of the treasurer the responsibility of filing monthly and quarterly reports with ULC Modesto. Petitioner's romantic relationship with Ms. Lawton and his employment relationship with Ms. Tyler both ended acrimoniously. Ms. Tyler's opinion of petitioner (after having been *619 escorted out of his office by police and sued by him) was that he was a "sick" person because he "enjoys hurting and degrading people the way he does and he gets so much pleasure from it." In early January, 1984, (during the course of his audit by the Internal Revenue Service, discussed below) petitioner sent a packet of blank checks from the First National account to Ms. Lawton with a note requesting that she sign and return them. Ms. Lawton, who had left petitioner in October 1983, signed some of the checks but then decided not to send the checks back to petitioner. She later told petitioner that she had never received them. The audit of petitioner by the Internal Revenue Service began in early 1983 when he was sent a letter requesting specific information about his charitable contributions for 1981. Upon receiving that letter, petitioner followed the instructions contained in a document he received from ULC Modesto entitled "Instruction for Annual Receipt of Contributions." The document stated in part that: WHEN you are first notified of an I.R.S. or State Audit of your contributions to this Church you SHOULD immediately: 1. Notify Headquarters of the Audit and request *620 information about the "Annual Receipt of Contributions" for the year mentioned. * * * When we receive your information, our Staff will examine all of your congregational files to determine if it is is (sic) in good standing and that at least the amount you have claimed has been reported on its Quarterly Reports. If all is in good order our Staff will issue and (sic) "Annual Receipt of Contributions" signed by a Staff member and the Corporate Seal affixed attesting it came from Modesto, California. Upon receipt of the "Annual Receipt," make copies of your individual receipts and a copy of the "Annual Receipt" and staple them together and submit them to the I.R.S. or State Agency. Remember * * * that the Universal Life CHruch (sic), Inc. is a recognized tax exempt non-profit religious organization. Pursuant to the above procedures, petitioner requested and received a letter on ULC Modesto letterhead labeled "ANNUAL RECEIPT OF CONTRIBUTIONS FOR THE YEAR OF 1981." The letter, which was signed "under penalty of perjury" by Andre Hensley in September, 1983, "gratefully acknowledged" petitioner's contribution of $ 13,000 during 1981 and cited the provisions of the Internal Revenue *621 Code exempting the ULC from tax and rendering contributions thereto tax deductible. Petitioner subsequently submitted that letter to the I.R.S. as substantiation of his 1981 charitable contribution deduction. During petitioner's initial audit interview with Revenue Agent Alma Izquierdo ("Agent Izquierdo") on April 1, 1983, petitioner presented numerous cancelled checks, receipts and invoices to verify his Schedule C expenses for 1981. Because the documents submitted were so numerous, petitioner agreed to leave them with Agent Izquierdo for photocopying. Agent Izquierdo also examined petitioner's ledger book for his dental business and did not find any discrepancy between the amounts reflected in his ledger and the amount reported by petitioner as gross income. In addition to the checks related to Schedule C expenses, petitioner submitted cancelled checks payable to his local charter of the ULC in support of his charitable contribution deduction for 1981. Petitioner refused to answer, however, when asked by Agent Izquierdo whether he was a priest. Agent Izquierdo, who was aware of a special I.R.S. tax protestor group that might be required to handle petitioner's case, informed *622 petitioner that she was not sure whether she would be able to conclude his case. Some time after their interview, petitioner telephoned Agent Izquierdo to inquire whether she would in fact be handling his case and was informed that it had been transferred to another agent. Agent Izquierdo never returned petitioner's original cancelled checks but forwarded them to the tax protestor group. In May, 1983, petitioner's audit file, including the cancelled checks, receipts, and invoices previously submitted to Agent Izquierdo for photocopying, was transferred to Revenue Agent Darlene Grace ("Agent Grace"), then a member of the tax protestor group. Agent Grace contacted petitioner on August 31, 1983 (five months after his interview with Agent Izquierdo) to schedule an appointment. An appointment was initially scheduled for September, 1983, but petitioner called to cancel the appointment and attempted to reschedule it for December, 1983, stating that the fall was his busiest time. Petitioner then agreed to meet with Agent Grace in October, 1983. The cancelled checks received by Agent Grace from Agent Izquierdo were in a state of disarray. Numerous invoices and receipts referring to *623 items represented by checks had also been submitted by petitioner, but were not stapled to or associated with the cancelled checks in any way. Agent Grace thus proceeded to create a detailed spreadsheet of the checks, invoices, and receipts, noting duplications where possible. Petitioner informed Agent Grace at or soon after their initial appointment that he noted a number of receipts and checks missing from the originals he had submitted to Agent Izquierdo. At the conclusion of their initial meeting, Agent Grace requested petitioner to submit some additional documentation. Petitioner sent Agent Grace a letter dated October 11, 1983 (the date of their meeting), stating: Dear Ms. Grace, As per our conversation today, the 5 month delay 4/1/83 - 9/1/83 in the assignment of my case to you has placed me at a very time-constrained situation. Many attempts via phone calls were made to Ms. Izquierdo to hurry the matter along as the summer is very slow for me. Since it is now my busy season the time I can alot for the (this?) audit is minimal and it take (sic) considerably more time to complete it. Sincerely, (signed) Bruce Goldberg, D.D.S. On November 23, 1983, not having received *624 any additional documentation from petitioner, Agent Grace sent him a letter stating that she had scheduled a second appointment for him for December 20, 1983. Petitioner called Agent Grace to cancel the December 20 appointment and suggested any time between December 26 and 31st. When Agent Grace said that she could not make an appointment at that time, petitioner suggested an appointment in the following year. Petitioner expressed anger about the five-month delay in returning his documents and hung up on Agent Grace when she mentioned that she would have to close the case based on available information if an earlier appointment could not be made. After petitioner contacted Agent Grace's manager and the Assistant District Director with complaints about Agent Grace, Agent Grace (at the direction of her manager) called petitioner back to schedule a January appointment. During that telephone conversation, Agent Grace informed petitioner that she would be examining his 1982 return as well as the 1981 return. Petitioner's response was that Agent Grace would have to finish the 1981 return first. Agent Grace continued her examination during two visits to petitioner's residence -- in *625 January and February, 1984. On both of her visits, which lasted approximately 3 1/2 or 4 hours, Agent Grace brought a second revenue agent along as a witness because she felt intimidated by petitioner and wanted a witness present if he made accusations against her. The majority of Agent Grace's time during her visits was spent reviewing and organizing the documentation submitted by petitioner in support of his 1981 Schedule C deductions, especially the deduction for supplies. Some of the receipts submitted by petitioner were for amounts well under $ 1. On February 22, 1984, Agent Grace sent a written Records Request to petitioner. The requested records included bank statements and cancelled checks for petitioner's business and personal accounts, depreciation records, Forms 940 and 941, workpapers used in preparing the returns in question, and records covering purchases of real estate or other property. On March 1, 1984, Agent Grace telephoned petitioner regarding the Records Request. Petitioner informed her that it would take 6-8 weeks to obtain the requested information, and when Agent Grace replied that she would have to take whatever "steps" she considered "necessary," petitioner *626 hung up on her. Agent Grace then decided, upon consultation with her manager, to have petitioner's bank records (including the bank records of the corporation) summoned. On March 1, 1984, petitioner sent a letter to Agent Grace which stated: Dear Ms. Grace, This is to confirm our conversation today. I have requested the documents you wanted and it will take 6-8 weeks to receive them. I will call you as soon as I have the information. Your patience in allowing for the time delay in processing our audit is appreciated. Very truly yours, (signed) Bruce Goldberg, D.D.S. On March 6, 1984, summonses were served on eight financial institutions requesting records of accounts held in the name of petitioner and the corporation, and accounts held in the name of the ULC over which petitioner had signatory authority. The summonses were not actually signed and served by Agent Grace, who had left town for two weeks after the decision to summon petitioner's bank records was made, but were served by another revenue agent. Petitioner's letter of March 1 (which was stamped "received" by the Internal Revenue Service on March 3) was therefore not read by Agent Grace until after the summonses *627 had been served. On March 22, 1984, petitioner, on behalf of himself and the corporation, filed a petition to quash the summonses in the United States District Court for the District of Maryland. The petition to quash, which was adapted by petitioner from a version supplied to him by ULC Modesto, asserted that the summonses were overbroad and violative of the ULC's First Amendment Rights, and that the government had failed to make a prima facie showing that enforcement was proper. Paragraph 6 of the petition to quash alleged that the requested records related to the ULC in Modesto, a California church. On May 31, 1984, the United States District Court issued an Order and Memorandum denying the petition to quash the summonses and granting the government's motion for summary judgment. A document entitled "Questions and Answers" received by petitioner from ULC headquarters stated: Q: Can the IRS see our congregation's bank records? A: Yes - but you should not show them your records. If the IRS wants to see them they must, first, get a court order (Section 7609(c) of IRS Code); and they must deal directly with ULC, Inc., that is: International Headquarters. Such a court order *628 can be appealed. If the IRS wants to see your bank records, tell them to contact, ULC, Inc. International Headquarters in Modesto, CA.
Q: The IRS has asked me for a list of questions about the congregation and its internal operations. Do I have to answer them? A: No; Section 7605(c) of the IRS Code strictly forbids this type of questioning, as it reveals a more complete disclosure than any audit could. Always refer them to International Headquarters. In preparing spreadsheets to calculate the corporation's deductible expenses, Agent Grace relied on the microfiche copies of checks and other records produced by the banks pursuant to the summonses. A significant number of these microfiche copies were unreadable, and some checks were missing. After the instant case was docketed with this Court, petitioner attended a settlement meeting with an appeals officer from the Internal Revenue Service. After the meeting proved unsuccessful, petitioner wrote a letter to the appeals officer's supervisor (with a copy to the Tax Court) complaining about the appeals officer's "hostile" attitude and indicating that his time was too valuable to be wasted in such a manner. OPINION Additions *629 to Tax for Fraud . Respondent contends that petitioners' underpayments of Federal income tax for the years in issue are due to fraud. During the years in issue, section 6653(b) provides for an addition to tax of 50 percent of the amount of an underpayment if any part of the underpayment is due to fraud. Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). That burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement of income. Drobny v. Commissioner, 86 T.C. 1326 (1986); Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970), *630 cert. denied 400 U.S. 827 (1970). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proved, however, by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). A corporation can only act through its officers, and corporate fraud necessarily depends upon the fraudulent intent of the corporate officers. Hicks Co. v. Commissioner, supra.
In support of his contention that the understatements by the corporation were due to fraud, respondent lists the following as "badges of fraud:" (1) intentional claiming of a cost of goods sold adjustment *631 for the corporation's fiscal year ending July 31, 1982 which deduction had no basis in fact or in law. (2) intentional overstatement of deductions for the corporation's fiscal years ending July 31, 1982 and July 31, 1983. (3) intentional claiming of false charitable contribution deductions to the ULC for the corporation's fiscal year ending July 31, 1983 and use of corporate funds funneled through the ULC accounts to pay personal living expenses of petitioner. (4) failure to maintain and to keep adequate books and records of the corporate expenses. (5) failure to submit complete books, records, cancelled checks and other documentation and when the records were summonsed by the respondent, seeking to quash the summonses. (6) all of the above acts being committed by an intelligent, well-educated doctor who successfully simultaneously ran two businesses. Respondent further asserts that petitioner's intent in setting up a ULC charter was tax avoidance, that petitioner methodically coerced Ms. Lawton and Ms. Tyler into signing blank checks and forms as a means of hiding his own control over how "church" funds were spent, and that petitioner cannot rely on his accountant's preparation *632 of his returns to hide his own fraud since petitioner made the decisions concerning the income to be reported and the deductions to be claimed on the returns. Respondent further cites petitioner's conduct at the audit level and at trial including: (1) submission of a false receipt from ULC Modesto as substantiation of his charitable contribution deduction, (2) sending of additional blank ULC checks to Ms. Lawton after the initial audit meeting, (3) alleged lies to a revenue agent and "stalling" tactics which forced respondent to utilize summonses to obtain necessary information, (4) filing of a petition to quash containing false statements, (5) alleged lies to this Court concerning weekly ministerial services, and (6) allegedly "selective" memory at trial. Despite the list of "badges" proferred by respondent, we find that respondent has failed to prove fraud by clear and convincing evidence. The first indicator of fraud proferred by respondent is the $ 40,797 "cost of goods sold" adjustment claimed on the corporation's return for the fiscal year ending July 31, 1982. [12] We find that respondent has failed to demonstrate that the adjustment was anything more than a case of a deduction *633 being claimed on the wrong line(s) of a return. The presence of a prominent "zero" on the schedule used to calculate "cost of goods sold" on the return immediately draws attention to the fact that the amount reported as "cost of goods sold" was, at the very least, misplaced. We find the obviousness of that reporting error, especially when made by a person of petitioner's intelligence, inconsistent with an attempt to deliberately conceal, mislead or prevent the collection of taxes. We note, moreover, that the claiming of a deduction in the approximate amount of $ 40,000 in a single, incorrect place on the return is consistent with the incorrect reporting of expenses by the corporation on its return for the fiscal year ending July 31, 1983. In considering the deductibility of corporate expenses for that subsequent period, Agent Grace separately analyzed the deductibility of each category of expense improperly "lumped together" as "other deductions," and petitioner testified at trial that he had lumped together the deductions on his corporate returns out of laziness or "to facilitate the ease of filling out the forms." *634 Under the circumstances of the instant case, we find petitioner's explanation of the corporation's "cost of good sold" adjustment -- as an improper "lumping together" of various other corporate expenses -- plausible. We note in that regard respondent's own assertion that the corporation "contributed" $ 14,000 to petitioner's local ULC charter during its fiscal year ending July 31, 1982 but did not deduct any of such amount on its return. That apparently illogical fact may be explained, as suggested by petitioner, by the inclusion of the $ 14,000 "charitable deduction" within the improper "cost of goods sold" adjustment. We further note that respondent has never attempted to show that the expenses which petitioner claims to have erroneously reported as "cost of good sold" were already claimed elsewhere on the returns of the corporation or of petitioner, or that the adjustment was otherwise unsupported by corporate expenses. While we do not condone petitioner's careless completion of the corporation's return for the period ending July 31, 1982, we are unconvinced that the cost of goods sold error is a clear and convincing indication of fraud. The second "badge" proferred by respondent *635 is an "intentional" overstatement of deductions on the corporation's returns for its fiscal years ending July 31, 1982 and July 31, 1983. We find that respondent has failed to show that any overstatement of deductions on the corporation's returns was intentional. While we recognize that direct proof of intent is rarely available and that fraud may sometimes be inferred from a pattern of overstating deductions, we find that the drawing of such an inference is not appropriate in the instant case. Putting aside the incorrect cost of goods sold adjustment, discussed above, and the improper deduction related to ULC, discussed below, respondent has failed to demonstrate that any deduction overstatements by the corporation were of a magnitude and consistency indicative of fraud. See Stone v. Commissioner, 56 T.C. 213, 224-226 (1971) (among other factors indicative of fraud, taxpayers' corrected taxable income for three consecutive years averaged approximately 500 percent of that reported on their return); Switzer v. Commissioner, 20 T.C. 759, 764-765 (1953) (fraud is not established merely by proof of a large understatement of income); Nicholson v. Commissioner, 32 B.T.A. 977, 989 (1935), *636 affd. 90 F.2d 978 (8th Cir. 1937) (if proof of deficiency were enough to establish fraud, "all taxpayers against whom deficiencies are determined would be * * * subject to the imposition of a fraud penalty"); Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court (consistent understatements for nine consecutive years coupled with weak or incredible explanations for the omissions suffice to establish fraud); Bond v. Commissioner, 232 F.2d 822, 826 (4th Cir. 1956), affg. a Memorandum Opinion of this Court, cert. denied 352 U.S. 878 (1956) (fraud addition sustained where, among other factors, Tax Court was impressed with "understatements * * * too large, too consistent, over too long a period, to be attributable to mere inadvertence or error").[13] Respondent may not rely on petitioners' failure to prove their entitlement to deductions to carry his burden of proving fraud. Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982). We also note that during the periods in question, petitioner's hypnosis business enjoyed a surge in publicity; petitioner's book on past-life *637 regression had just been published and had attracted significant media attention, and petitioner traveled throughout the country promoting the book. Under such circumstances, we find that petitioner's failure to keep adequate records of corporate expenses may be explained by his extremely busy schedule and focus on new professional activities and do not find such failure indicative of a motive to conceal.[14] While we do not condone petitioner's negligence in keeping records and in preparing corporate returns, negligence, even extreme negligence, is not tantamount to fraud. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968). With respect to petitioner's alleged failure to submit complete documentation to *638 the Internal Revenue Service at the audit stage, we note that the evidence presented at trial was confused and that respondent failed to adequately document specific instances of such conduct by petitioner. Agent Izquierdo was, for example, unable to testify about specific items petitioner failed to produce at their first meeting, as she did not have her workpapers to refer to. [15] We also find Agent Izquierdo's testimony that petitioner told her he had only one bank account unconvincing in light of Agent Izquierdo's failure to bring her notes of this incident, and in light of testimony from Agent Grace indicating that petitioner submitted documentation from more than one bank account to Agent Izquierdo. Cf. Stone v. Commissioner, supra, citing Smith v. Commissioner, 32 T.C. 985, 987 (1959) (lying to revenue agent about number of bank accounts evidences fraud). The testimony of Agent Grace, moreover, left us with the impression that her examination of the records petitioner did submit was tedious and took much longer than expected. [16] Under such circumstances, with visits and contacts by Agent Grace continuing, petitioner may reasonably have believed *639 that he could wait before submitting additional records. While petitioner's behavior at audit (as reflected by his statement that Agent Grace would have to finish the 1981 examination before starting 1982) may have been hostile and arrogant, we do not find it fraudulent. The only example of a failure by petitioner to produce records which was adequately documented by respondent involved the February 22, 1984 Records Request. In that regard, however, we find petitioner's explanation that it would have taken 6-8 weeks to obtain the needed records from the banks plausible; in fact, he sent a letter to that effect to Agent Grace. We closely observed petitioner's demeanor and found him to be a credible witness. *640 We also find petitioner's submission of the "receipt" he obtained from ULC Modesto, and his filing of a petition to quash the administrative summons for bank records, insufficient evidence of fraud. We recognize that in the recent case of Wedvik v. Commissioner, 87 T.C. 1458 (1986), cited by respondent in his brief, we found the filing of a petition to quash by another ULC charter member to be indicative of fraud. In that case, however, we noted that the bank records that were the subject of the summons were "essential to discovery of the check swapping schemes" (under which the taxpayers made "contributions" to ULC charters controlled by their friends or to the ULC "Receipts and Disbursements Trust Fund" and immediately received back matching checks, along with receipts for the phony contributions). Moreover, our holding in Wedvik did not turn on the filing of the petition to quash; rather, we specifically stated therein that the existence of the check swapping schemes was in itself sufficient to carry respondent's burden of proof. Wedvik v. Commissioner, supra at 1469. The majority of respondent's other contentions on the fraud issue *641 center around petitioner's formation and operation of a local charter of the ULC. We find, however, that petitioner's motive in forming and operating a ULC charter was not per se evidence of fraud. See Stephenson v. Commissioner, 79 T.C. 995, 1006-1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984) (fact that the taxpayer "should have had doubts as to whether he could escape taxation by his creation of the 'church,' do not by themselves conclusively establish that [the taxpayer] had the actual intent to evade tax"). [17]
While petitioner's act of sending additional blank ULC checks to Ms. Lawton after his audit had begun is particularly suspicious, respondent has offered no evidence of petitioner's motive in doing so, and, since Ms. Lawton decided not to comply with petitioner's *642 request that she sign the checks, we will never know for what purpose petitioner would have used the checks had he received them. Cf. Stephenson v. Commissioner, supra (backdating checks is strong evidence of fraud). Mere suspicion, however, is not sufficient to support a finding of fraud. Katz v. Commissioner, 90 T.C. 1130 (1988). Respondent draws our attention to Ms. Tyler's testimony that petitioner said that "[the ULC] was a way around the government to avoid paying taxes, and that he had paid those S.O.B.'s enough money and he wasn't paying anymore." However, we give such testimony by Ms. Tyler little or no evidentiary weight based on Ms. Tyler's extreme animosity toward petitioner. We also found petitioner's testimony at trial that he actually did conduct services as a minister unnecessary. However, we note that petitioner's career as a specialist in "past-life regression" and "future-life progression" lends some credence to his story, and that respondent has been unable to show that no services actually occurred. Accordingly, respondent's unsupported contention that petitioner did not conduct services is insufficient to meet *643 his burden of proof on the fraud issue. Finally, we note that petitioner's failure to name his ULC charter as the recipient of charitable contributions on some of his returns does not, in our view, rise to the level of "concealment," since the ULC was named as recipient on two of the returns and plausible explanations were given with respect to the other returns. [18] Regarding the role of petitioner's accountant, while we agree with respondent that petitioner cannot rely on his accountant's preparation of his returns as a complete defense to fraud, the failure of such a defense does not affirmatively satisfy respondent's burden of proof on the fraud issue. Respondent has made repeated references to petitioner's intelligence *644 and education in support of his assertions of fraud. However, as we stated in Brown v. Commissioner, T.C. Memo. 1977-138, in which the taxpayer held a Ph.D. in organic chemistry and was a university professor: [Petitioner's] education and sophistication would certainly justify the conclusion that he should have known better and that he was negligent - indeed, grossly negligent. But these elements do not constitute proof that he did know better and, therefore, that his returns were fraudulent. [Emphasis supplied.] Accordingly, we hold that petitioners are not liable for the additions to tax for fraud for any of the taxable years in issue. Extension of the Period of Limitations Under Section 6501(c)(1). Respondent concedes that petitioner's returns for the taxable years 1981 and 1982 and the corporation's return for its fiscal year ending July 31, 1982 were filed more than three years prior to the mailing of the relevant notices of deficiency, and that, under the general 3-year rule of section 6501, assessment of tax for such periods is barred. Respondent asserts, however, that the instant case falls within the exception to the general period *645 of limitations set forth in section 6501(c)(1). Section 6501(c)(1) states that: "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." Respondent's burden of proving the exception to the general period of limitations set forth in section 6501(c)(1) is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967) revg. on other grounds 46 T.C. 622 (1966); Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Neaderland v. Commissioner, 52 T.C. 532, 541 (1969), affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970). Accordingly, as we have found neither petitioner nor the corporation liable for any additions to tax for fraud under section 6653(b), section 6501(c)(1) cannot apply to lift the bar of the period of limitations for the taxable years in issue. Deductibility of Amounts Claimed as Charitable Contributions. Petitioner concedes that the assessment and collection of tax for the taxable year 1983 is not barred by the period of *646 limitations and that he is not entitled to deduct the $ 25,000 transferred to his ULC accounts in that year as a charitable contribution under section 170. Petitioner argues, however, that some portion of that $ 25,000 is properly deductible under other provisions of the Internal Revenue Code. Petitioner in effect asks us to evaluate the deductibility of expenditures made from his ULC accounts as if those expenditures had been made by him directly without regard to the formation of a ULC charter. We need not address the merits of this proposition, [19] however, because we find that petitioner has failed to establish that any of the expenditures made from his ULC accounts during 1983 would give rise to deductions in excess of the amounts already allowed by respondent. [20]
*647 Petitioner bears the burden of proving both his entitlement to, and the amount of, the claimed deductions. Rule 142(a). Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). In support of his claim that certain amounts expended from his ULC accounts are properly deductible, petitioner submitted a list entitled "Universal Life Church, Inc. Checks paid for Bonafide Businesses Expenses by Petitioner or Secretary or Treasurer of Universal Life Church, Inc. Congregation #48821." Petitioner also submitted copies of cancelled checks, invoices, and receipts representing items on the list. [21] As the numerous checks submitted by petitioner fall into a few discrete categories, we will address them here by category. *648 A significant portion of the checks submitted by petitioner in support of his claim for additional "business expense" deductions relate to maintenance costs of his residence. Those include checks payable to Chemlawn (lawn service), Director of Finance (water bills), Baltimore Gas and Electric, and A. J. Romano. Petitioner asserts that he is entitled to a "27% home office deduction" for those expenditures in light of the exclusive use of 27% of the square footage of his home by the corporation. Petitioner's argument that some of the maintenance costs of his residence are deductible by reason of the corporation's business use of the premises fails for two reasons. The first is that the argument ignores the basic distinction between the "trade or business" of a corporation and that of its shareholders. As a general rule, the business expenses of a corporation are not deductible by its shareholder on his personal returns. Deputy v. du Pont, 308 U.S. 488 (1940). [22] Thus, the fact that the corporation used a portion of petitioner's residence for business purposes does not convert that portion into "business property" of petitioner as an individual. *649 Petitioner's argument also fails because the evidence indicates that petitioner, as an individual, did not hold his residence for use in a trade or business or as income-producing property. The only item in the record which might suggest otherwise is the 10-year lease between petitioner and the corporation. [23] The existence of that lease might at first suggest that petitioner, as an individual, should be entitled to deduct the costs of maintaining the leased property. A closer examination of the facts, however, clearly precludes such a result. Petitioner failed to report any rental income on his returns for 1982 or 1983, and the corporation failed to report any deduction for rent expense for its fiscal year ending July 31, 1983. *650 Because the parties to the lease did not respect the lease arrangement for tax purposes, we believe the lease was not bona fide. Moreover, even if we believed that a bona fide leasing arrangement actually existed between petitioner and the corporation, the manner in which the "rent" under the lease was calculated -- i.e., as a straight percentage of petitioner's maintenance expense for the residence -- indicates to us that petitioner was not interested in a profit on the transaction. [24] Accordingly, we hold that petitioner is not entitled to deduct any of his costs of maintaining his residence. The second category of ULC checks submitted by petitioner relates to automobile-related expenses paid to payees including Exxon, Crown Central, Sears, Leo's Garage, Geico, and National Surety Corp. In support of his claim that the automobile expenses are deductible, the only "evidence" offered by petitioner was *651 his own testimony that, because Ms. Lawton lived with him through October 1983 and had a car which they used for personal purposes, the expenses relate to a second car which was used exclusively for business purposes. We are not required to accept petitioner's self-serving, nonspecific testimony as gospel. Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court. Petitioner's testimony is simply insufficient to establish his entitlement to business expense deductions related to the automobile. The third category of checks relates to telephone bills for a telephone which petitioner claims was exclusively used for business calls. We find that petitioner has failed to submit adequate proof of the business use of that telephone. Petitioner failed to specify whether the telephone number was used for the dental business, the hypnosis business, or both, and has failed to demonstrate that the telephone calls for which he claims deductions were calls to patients of his hypnosis or dental practice or otherwise related to business. For his claim of deductibility, petitioner instead relies on the fact that he had a second "private" *652 telephone number at his residence which was installed in June, 1982. Petitioner's testimony is again simply insufficient to prove the deductibility of the telephone expenses in question. [25]
Petitioner also submitted checks that were payable to Loyola College. Petitioner claims that the purpose of those checks was to pay for psychology books used in his business. In view of the fact that Ms. Lawton was a student at Loyola College during the period in which the books were purchased, we are unconvinced that the books were purchased for petitioner's business rather than for Ms. Lawton's education. Another category of checks submitted by petitioner related to quarterly and monthly reports for petitioner's local ULC charter. The checks were payable to ULC Modesto, and some of them bore the notation "Donation to Mother Church." In support of the deductibility of those fees, petitioner *653 stated at trial that they "should be considered business expense because those were quarterly report expenses that maintained the business as you would pay dues. Therefore, petitioner feels that those expenses, small as they may be, are still a bona fide business deduction for a business that was, in fact, created for Universal Life Church." On brief, petitioner argued that because he held weekly services, his ULC charter was a "business enterprise as any other bonafide business." Petitioner's claim that his "church" was a "trade or business" for tax purposes, however, is completely unsupported by the record as well as by the case law defining "trade or business." Commissioner v. Groetzinger, 480 U.S. 23 (1987). Accordingly, we hold that petitioner is not entitled to any deduction for the ULC charter expenses. Finally, petitioner submitted numerous cancelled checks and statements related to credit card payments. The statements included payees such as Hecht's, Spencer Gifts, Inc., Dogwood Kennels and China Closet. Because petitioner has not explained the business purpose of those payments, we hold that petitioner is not entitled to any deduction for the claimed *654 expenses. Petitioner has also failed to support adequately his claim for deductions with respect to postal expenses and with respect to a payment to "Current, Inc." Underreporting of Interest Income and Substantiation of Corporate Expenses. The parties are in agreement that the assessment and collection of tax for the corporation's fiscal year ending July 31, 1983 is not barred by the period of limitations. Respondent claims that the corporation failed to report interest income of $ 983.54 received during its fiscal year ending July 31, 1983. Petitioners do not dispute the taxability of the interest or its receipt during that year. Petitioners argue, however, that the corporation should not be held liable for failure to report the interest income because: (1) the amount of interest could not be determined in time to report it on the return for the fiscal year in question, as no Form 1099 was received until January, 1984; (2) the amount was actually reported on the corporation's return for its fiscal year ending 7/31/84 [26] as advised by Mr. Rosenberger; and (3) it is too late to amend the return so as to claim a refund for the subsequent year in which the interest was *655 incorrectly reported. While arguments (1) and (2) certainly indicate that the petitioners acted in good faith with respect to the reporting of the interest income, intent is irrelevant to the question whether income which is properly includible in a particular year was omitted. The fact that the income may have been reported on a subsequent return is also irrelevant; the corporation did not have the freedom to choose the taxable year within which to report the interest income. Petitioners' argument that it is now too late to amend the corporation's return for the fiscal year ending July 31, 1984 is irrelevant to the proper amount of income to be included in the taxable year in issue; we point out, however, that Congress has granted relief from the situation of "double inclusion" of income to the extent provided in sections 1311-1314. We therefore sustain respondent's determination on the interest income issue. Respondent further claims that the corporation has failed to substantiate its entitlement to deductions, *656 in excess of those already allowed, for the following categories of expenses: [27]
Amount Claimed
Amount Allowed
Category
on Return
By Respondent
Wages
$ 51,105.00  * $ 51,105.00   Advertising
4,535.08  3,179.33   Medical Reimbursement
785.02  - 0 -    Taxes (Payroll and
State Taxes)
12,107.11  2,313.11   Supplies
10,511.49  676.59   Postage
1,360.73  1,049.46   Books and Subscriptions
402.10  211.95   Collection Fees
129.00  47.00   Telephone
387.19   - 0 -    Bank Charges and Bad checks
3,113.19  ** 38.00   Book Promotions
3,127.50  - 0 -    Medical
85.23  - 0 -    Travel
79.00  - 0 -    Seminars
4,342.00  692.07   Book Expenses
1,876.00  - 0 -    Clothes
16.50  - 0 -    Legal
293.84  - 0 -    Repairs and Maintenance
83.80  - 0 -    Education
36.84  - 0 -    *657 We have painstakingly reviewed the hundreds of cancelled checks, bills, and receipts which comprise the exhibits submitted in support of the corporation's claim for additional deductions and find as follows: Wages. We reject the corporation's claim for an additional deduction in the amount of $ 4,995. That claim is based on the fact that $ 56,100 was reported by petitioner on his 1982 return as salary from the corporation. As the taxable years of the corporation and petitioner (both cash method taxpayers) are different, the amount reported as salary on petitioner's return for the calendar year 1982 is not proof that the corporation paid the same salary for its fiscal year ending July 31, 1983. Furthermore, petitioner has not argued that the corporation actually paid the additional $ 4,995 to petitioner during the corporation's taxable year, and no substantiation of such amount has been presented. Petitioner's brief merely notes the discrepancy in numbers without further explanation. [28] Accordingly, we hold that the corporation is not entitled to deduct the additional $ 4,995. *658 Advertising. We find that the corporation is entitled to additional deductions in the amount of $ 521.50, for payments to "Yvonne Johnson" and to the A.W.R.T. ("American Women in Radio and Television"). Petitioners' submission of a promotion contract between the corporation and Yvonne Johnson and a letter from Johnson describing the A.W.R.T., as well as petitioner's testimony at trial and submission of cancelled checks supporting those amounts, are sufficient in our view to satisfy petitioners' burden. With regard to petitioners' claim that the corporation paid an additional $ 700 to Ms. Lawton for marketing services as an advertising expense, we have given consideration to petitioner's testimony. In view of the circumstances, however, including the fact that Ms. Lawton was living with petitioner at the time that the alleged payments "for marketing services" were made, the fact that Ms. Lawton was a dietician by trade who was just completing her schooling in marketing, and the inconsistency of the amount paid to Ms. Lawton as compared with the hourly rate stated in a "marketing contract" submitted in evidence by petitioners, we hold that the corporation is not entitled to *659 deduct such amount. We also note that petitioner submitted, on behalf of the corporation, several cancelled checks payable to "Super TV" as substantiation of additional advertising expense. In view of petitioner's testimony at trial that Super TV was used to advertise for his "church" in an attempt to attract parishioners, and petitioner's failure to specify how Super TV was used by the corporation, we hold that the corporation is not entitled to deduct the amounts paid to Super TV. Medical Reimbursement. We find that the corporation has substantiated its entitlement to the $ 785.02 deduction claimed. Respondent's notice of deficiency states as its sole reason for disallowing the deduction that "[the corporation has] not shown these amounts were paid." In view of petitioner's submission, on behalf of the corporation, of cancelled checks in excess of $ 785.02 with the notation "medical reimbursement" as well as a corporate document purporting to be a section 105 "medical reimbursement plan," we find that the corporation has proved that the amount claimed as a deduction was "paid." In that regard, we note that respondent has never questioned the validity of the medical reimbursement *660 plan itself or requested substantiation of the underlying medical bills. Taxes. We find that the corporation is entitled to a deduction of $ 3,700.82 in excess of that allowed by respondent for estimated and final state corporate income tax payments. Section 164 generally allows a deduction for taxes paid or accrued during the taxable year. Estimated tax payments are generally deductible by a cash method taxpayer in the year of payment. Glassell v. Commissioner, 12 T.C. 232 (1949); Estate of Lowenstein v. Commissioner, 12 T.C. 694 (1949), affd. on other issues sub. nom. First National Bank v. Commissioner, 183 F.2d 172 (5th Cir. 1950), cert. denied 340 U.S. 911 (1951). Furthermore, the dates of the checks submitted in substantiation of the state corporate income tax payments coincide with the due dates for such payments under Maryland's state corporate income tax statute. See Md. Tax-Gen. Code Ann. Sec. 10-821(a)(1)(ii), 10-821(b), 10-902(a) (1988). Accordingly, we hold that the corporation is entitled to deduct the estimated state taxes substantiated by petitioner. With respect *661 to the deductions for the withholding taxes which remained in dispute at the commencement of trial, petitioner conceded at trial that he was misinformed in his belief that such taxes were deductible. Respondent's disallowance of such deductions is sustained. Office Supplies. We find that the corporation has not established its entitlement to any deductions beyond those conceded by respondent. In support of the corporation's claimed deduction of $ 10,511.49 for supplies, petitioners submitted approximately $ 5,500 in credit card statements and approximately $ 690 in cancelled checks the majority of which bear the notation "supplies." Respondent allowed $ 676.59 as a deduction for supplies. The credit card statements submitted in support of the deduction for supplies included payees such as Hunan Szechuan Restaurant, the Fashion Post, K-Mart, Woolworth and the Rusty Scupper, in addition to Radio Shack, Atlantic Video Center and the Consumer Company. The vast majority of the payees listed on the credit card statements appear to be businesses that sell ordinary consumer items. The only evidence linking payees from the credit card statements to the corporation's business were *662 petitioner's statements on brief and at trial that the payments to Radio Shack, "telephone electronics," Saxitone Tape Sales, Atlantic Video Center, Electronic Concepts and several other companies were for supplies (such as tapes transferred to hypnosis patients) or equipment. While we recognize that some of the amounts represented by the credit card statements may have been used for business supplies, we find petitioner's nonspecific testimony insufficient to establish any deduction. [29] Cf. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). As we stated in Neaderland v. Commissioner, 52 T.C. 532, 539 (1969), affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970): Evidently petitioner felt he could sustain his burden of proof by simply introducing into evidence canceled checks, bank statements, and a few receipts and testifying, generally, that his expenditures were for business purposes. This type of evidence in no way shows us for what purpose the expenditures were made. Other than his own general testimony he presented no records or proof of any substance as to the purpose for the expenditures he actually *663 incurred. This kind of testimony does not provide a foundation for allowing disallowed expenses as "ordinary and necessary" business expenses. Under the circumstances of the instant case, respondent's disallowance is sustained. Postage. Respondent's disallowance is sustained in light of the clearly insufficient number of cancelled checks submitted in substantiation of the claimed deduction. [30]
Books/Subscriptions. We find that the corporation is entitled to an additional deduction of $ 56.50 for AFTRA ("American Federation of Television and Radio Artists") dues and an additional deduction of $ 2.50 paid to the Golden Temple for a holistic health *664 network directory. Collection Fees. The corporation has failed to establish its entitlement to deductions in excess of those allowed by respondent. Petitioner submitted, on behalf of the corporation, checks to various courts referring to collection suits against certain persons as well as bills from a law firm (which bear petitioner's notations) for collection work. Petitioner, however, never identified the persons whose names appear on the checks as hypnosis patients, and a comparison of the bills and accompanying notations with the checks indicates that at least one of the suits with respect to which the corporation now claims a deduction may have been against a dental patient. As noted previously, petitioner's dental practice was carried on individually, not by the corporation. In view of the lack of additional supporting documentation, we find that the amount in dispute for collection fees has been inadequately substantiated. Telephone. We find that the corporation is entitled to no additional deductions for telephone expenses for the reasons set forth in our discussion related to petitioner's claimed deduction for telephone expenses. We further note that *665 the telephone number on the bills submitted in support of the corporation's claim for deductions is the same number that appears on bills submitted in support of petitioner's claim for deductions. While the telephone could have been used for calls to both hypnosis and dental patients, we have been presented with no allocation of those uses or with any other method of calculating the amount, if any, related to the business of the corporation as an entity. We also note that, had the lease between the corporation and petitioner been respected by the parties, the corporation would not have had any expenses related to the telephone in question, as all such expenses would have been paid by petitioner. [31] Based on the record in the instant case, we hold that the corporation is not entitled to a deduction for telephone expense. Bank Charges/Bad Debts *666 . We find that the corporation has failed to establish its entitlement to deductions in excess of those allowed by respondent in this category. The amount in dispute appears to be equal to the sum of the amounts stated on certain checks payable to the corporation. Those checks, however, were later dishonored by the drawee banks. No evidence has been offered to prove that those amounts were ever included in the corporation's income; indeed, such inclusion may not have been proper. See Don E. Williams Co. v. Commissioner, 429 U.S. 569 (1977) (check is equivalent to a conditional payment); Estate of Spiegel v. Commissioner, 12 T.C. 524 (1949); Fischer v. Commissioner, 14 T.C. 792, 801-802 (1950) (check is equivalent to a conditional payment). In light of the fundamental principle that no deduction is allowed for the loss of "anticipated income" which has never been reported, see Hutcheson v. Commissioner, 17 T.C. 14, 19 (1951); Holman v. Commissioner, 66 T.C. 809, 817 (1976), affd. 564 F.2d 283 (9th Cir. 1977), the submission of bank statements documenting the return of dishonored *667 checks is, in itself, insufficient to support the claimed deduction. We further note that, even if evidence had been submitted to the effect that the amounts in question were once included in gross income, no evidence has been offered to suggest that such amounts were sufficiently "uncollectible" during the tax year in question to support an offsetting deduction under section 166. Book Promotions. We find that the corporation has substantiated its entitlement to an additional deduction of $ 3,127.50. In support of that deduction, petitioners submitted statements from the Newcastle Publishing Company documenting royalties generated by petitioner's book, "Past Lives, Future Lives," and indicating that the amount of such royalties was offset by the cost of the "author's copies" of the book ordered from the publishing company. One of the statements submitted indicates that $ 4,139.70 in royalties were earned from March 10, 1982 through October 31, 1982, and were offset by "author purchases" totalling $ 3,127.50. On the corporation's income tax return for its fiscal year ending July 31, 1983, that same $ 4,139.70 was reported as gross royalty income and the $ 3,127.50 amount *668 was claimed as a deduction for "book promotions." Although a portion of the $ 3,127.50 amount relates to books which were ordered from the publisher prior to the commencement of the corporation's fiscal year ending July 31, 1983 (i.e., prior to August 1, 1982), we find that the entire amount was "paid" by a credit against income in October, 1982, and hence is a proper deduction by the corporation against gross royalty income for the fiscal year ending July 31, 1983. Medical. We find that the corporation has failed to substantiate its entitlement to any additional deductions for medical expenses. In that regard, we note our prior holding with respect to the corporation's "medical reimbursement plan." Petitioners have failed to offer any evidence of the relationship of the claimed medical expense deductions to such plan. We also note that two of the cancelled checks submitted in support of the claimed deduction for medical expenses were drawn on one of petitioner's personal accounts rather than on an account of the corporation. Those checks may represent amounts for which the corporation reimbursed petitioner and was already allowed a deduction. A third check submitted in *669 support of the claimed medical expense deduction was written to "Union Trust Bank" as payee without further explanation of its "medical" purpose. Accordingly, we hold that the corporation is not entitled to the claimed medical expense deduction. Travel. The corporation has failed to substantiate its entitlement to the claimed deduction, in that petitioners submitted only a cancelled check payable to "Sunsets Unlimited Travel Club" with no further indication of the business purpose for the payment. We hold that the corporation is not entitled to any deduction for travel expenses. Seminars. We have examined the often-duplicative receipts, invoices, and checks submitted in support of the claimed deductions, and find that the corporation has substantiated its entitlement to additional deductions totalling $ 839.52. That amount represents the costs of: seminar rooms for "past life" seminars offered at the Quality Inn ($ 340 additional allowance); a "dream workship" ($ 50 additional allowance); a payment to the Manchester Hotel ($ 8 additional allowance); [32] and certain costs related to a conference of the Association for Past-Life Research and Therapy ("APRT") ($ 441.52 *670 additional allowance). We sustain respondent's disallowance of car rental, entertainment, miscellaneous, and per diem expenditures related to the APRT conference based on a lack of evidence of business purpose for those costs and, in the case of many of those claimed expenses, a complete absence of back-up documentation. Book Expenses. The corporation has failed to substantiate its entitlement to the claimed deduction. The only items submitted in support of the deduction are miscellaneous copies of credit card imprints to payees such as PMI Parking and Howard Johnson, hotel invoices, and copies of plane tickets. The total of the amounts stated on those disorganized and sometimes unreadable copies is less than one half of the amount of the claimed deduction; the majority of the claimed deduction is completely unsupported by back-up documentation. In view of the absence of any specific evidence as to the business purpose of the claimed expenditures, respondent's disallowance is sustained. Clothing Expenses. We find that the corporation has failed *671 to substantiate its entitlement to a deduction for "clothing expense." In support of the claimed deduction of $ 16.50, petitioners submitted a drycleaner's receipt for $ 9 which states "2 ties to be narrow to 2 1/4 inches" and cancelled checks of $ 9 and $ 7.50, one made out to cash and another to an individual. The payment of a shareholder's personal living expenses by his wholly-owned corporation does not convert such expenses into deductible business expenses, and no evidence has been presented indicating that those expenses were related to petitioner's employment with the corporation. See section 262. Legal. We sustain respondent's disallowance of the claimed deduction of $ 293.84 for legal fees. In support of the claimed education, a check in the amount of $ 293.84 was submitted. That check was dated July 21, 1982, a date which is 11 days prior to the commencement of the taxable year in issue, but was not cashed until August, 1982, i.e., within the correct taxable year. A check is considered a "conditional payment" for tax purposes. Upon the "honoring" of a check by the drawee bank, the payment becomes absolute and is deemed to relate back to the date of delivery *672 of the check. Estate of Spiegel, 12 T.C. 524 (1949); Don E. Williams Co. v. Commissioner, 429 U.S. 569 (1977) (citing Estate of Spiegel for proposition that check is conditional payment). Thus, in Schroeder v. Commissioner, T.C. Memo. 1986-583, we stated: "If a check is dated in one year but cashed in the next, the deduction will not be allowed in the later year, absent proof that delivery was actually made in the later year." In the instant case, as no proof was submitted indicating that the check for legal fees was delivered by the corporation on or after August 1, 1982, the deduction is denied. Repairs. The claimed deduction for repairs is denied based on a lack of evidence of the business purpose for the expenditures. Education. The claimed deduction of $ 36.84 is denied based on lack of evidence of business purpose for the payments. We note that, of the $ 36.84 in dispute, $ 31.84 was paid to Loyola College and to the Loyola College Bookstore. At the time of the payments, Ms. Lawton was attending Loyola College, and petitioners have not proved that such payments were for a corporate business purpose *673 rather than for Ms. Lawton's education. Rule 142(a). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. These cases were consolidated by order of the Court. For convenience, unless otherwise indicated, these cases will be collectively referred to as "the instant case."↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Corporation claims an additional deduction of $ 4,995. *↩ plus 50 percent of the interest due on the portion of the underpayment attributable to fraud.
3. The parties stipulated that a transposition error was made in the statutory notice of deficiency issued to Bruce Goldberg, Inc. for the fiscal year ending 7/31/83. The deficiency for such period detailed on Form 4549-A (Income Tax Examination Changes) included a disallowance of $ 3,156 in claimed deductions for advertising expense. The correct amount in dispute for advertising is $ 1,355.95. * plus 50 percent of the interest due on the portion of the underpayment attributable to fraud.↩
4. Petitioner Bruce Goldberg is referred to herein as "petitioner." Petitioner Bruce Goldberg, Inc. is referred to herein as "the corporation." Petitioner and the corporation are sometimes referred to as "petitioners."↩
5. In the Stipulation of Facts submitted by the parties, respondent objected to the admission of the documents entitled "Information Monthly," Minister," and "Become a Minister and Start a Tax Exempt Church" on the basis of authenticity as well as relevancy and hearsay. Respondent's arguments at trial and on brief, however, indicate that his authenticity objection to the admission of such documents has been abandoned.↩
6. Apparently, petitioner was making reference to a pretrial telephone conference among the parties and the Court to discuss the matter. The conference was not a matter of record, and no action was taken by the parties or the Court with respect to matters discussed in that telephone conference.↩
7. Respondent does not rely upon Rule 41(b)(1), possibly because petitioner has not at any time consented to the trial of the issue in question.↩
8. On August 28, 1984, the Internal Revenue Service issued a letter ruling retroactively revoking its prior ruling of April 13, 1976 which recognized the tax-exempt status of ULC Modesto. The ULC subsequently instituted suit in the U.S. Claims Court requesting a declaration that it was exempt under section 501(c)(3). The U.S. Claims Court on November 10, 1987, granted the government's motion for summary judgment and dismissed the ULC's complaint. See Universal Life Church, Inc. v. United States, 13 Cl. Ct. 567 (1987), later proceeding 14 Cl. Ct. 343 (1988) (costs awarded to Internal Revenue Service), affd. without opinion 862 F.2d 321↩ (Fed. Cir. 1988).
9. Of the $ 30,289 deducted in 1982, respondent conceded the deductibility of $ 200, equal to the value of certain items given to Goodwill. ↩
10. A schedule detailing the amounts claimed as "other deductions" was attached to the return. This schedule showed a $ 4,000 charitable contribution but failed to name the recipient.↩
11. One of the documents noted an Encino, California, address for the ULC; another noted a Brooklyn, New York, post office box. However, as the documents contain information about general ULC policy, we refer to them as originating from ULC headquarters in Modesto, California.↩
12. Apparently as a result of an error in preparing the statutory notice of deficiency issued to the corporation, respondent's determination with respect to the corporation's fiscal year ending July 31, 1982 failed to take into account the incorrect cost of goods sold adjustment. At trial, respondent moved for an increased deficiency and accompanying addition so as to take this item into account. As discussed below, we find that the period of limitations bars the assessment and collection of tax for the corporation's fiscal year ending July 31, 1982. Thus, we need not rule on the substance of respondent's motion.↩
13. See also Stonecipher v. Commissioner, T.C. Memo. 1988-41↩, and the cases cited therein (respondent introduced no evidence of "consistent failure to report substantial amounts of income over a number of years," and one year's understatement of taxable income is certainly not of conclusive significance). 14. See Fame v. Commissioner, T.C. Memo. 1983-421↩ (inadequate records due to carelessness and busy schedule).
15. Agent Izquierdo's only specific recollection was that petitioner did not submit adequate back-up documentation of his travel and entertainment expenses, having submitted only cancelled checks. However, we do not find petitioner's failure to submit the additional documentation required under section 274 indicative of a refusal to cooperate with respondent's agents. ↩
16. On direct examination by respondent, Agent Grace described petitioner's "file" (which she had received from Agent Izquierdo) as follows: what I remember most distinctly about the envelope and the contents therein, is that there were, I would even say, over 100 receipts just placed, tossed, whatever, in the envelope. And when you pulled it out there were scatters of little receipts and checks and invoices and cash register tapes that were all in no discernible order, but they were in the envelope.↩
17. See also Bobbitt v. Commissioner, T.C. Memo. 1987-328 (founders of local ULC charter not held liable for fraud addition); Harding v. Commissioner, T.C. Memo. 1986-299↩ (founders of local charter of "Solar Oriented Life Church" not liable for fraud addition where taxpayers made no effort to conceal their activities or mislead respondent).
18. See Harding v. Commissioner, supra, in which taxpayers who failed to name their in-home "church" as the recipient of charitable contributions were not held liable for the fraud addition. In that case we stated: "While LMI and SOL [the "church" organizations] were not named on petitioners' returns * * * respondent had no difficulty in discovering the facts." [51 TCM 1461↩, 1464, 55 P-H Memo T.C. par. 86-299 at 1286.]
19. Since the corporation, as well as petitioner, transferred funds to the ULC accounts, the question arises whether petitioner could properly claim all allowable deductions for expenditures made from those accounts without also taking into account dividend income from the corporation. ↩
20. Respondent has conceded that, of the $ 25,000 transferred to ULC accounts during the taxable year 1983, $ 1,153 (used for payment of property taxes) and $ 6,393.29 (used for payment of mortgage interest) are properly deductible by petitioner.↩
21. At the close of trial, petitioner attempted to introduce into evidence a clear plastic bag full of original checks in support of his claim for additional deductions. Petitioner admitted that the checks in the bag were the same checks submitted to respondent for the purpose of producing joint exhibits, but claimed that some of the checks were missing from the joint exhibits. Petitioner, however, was unable to specify which checks represented items missing from the joint exhibits and which checks represented duplications of items already in evidence. The submission of the bag of checks at the close of trial violated this Court's Standing Pretrial Order and its admission into evidence was denied. Although the checks were in a bag, they could best be termed a "shoebox full of checks." See, e.g., Patterson v. Commissioner, T.C. Memo. 1979-362↩ (inadequacy of "shoebox method").
22. See also Dietrick v. Commissioner, T.C. Memo. 1988-180, affd. 881 F.2d 336↩ (6th Cir. 1989).
23. While petitioner's dental practice was operated as a sole proprietorship, the record in the instant case indicates that his dental practice was not carried on at his residence (with the possible exception of some telephone work or paperwork performed by Ms. Tyler at petitioner's residence). Moreover, petitioner does not argue that any of his home maintenance costs are deductible by reason of the use of his residence for the dental practice.↩
24. See, e.g., Bistrup v. Commissioner, T.C. Memo. 1980-402↩ (where corporation merely paid expenses of operating its shareholders' automobile, shareholders had no opportunity for profit from the "leasing" activity and were denied depreciation deductions).
25. We note that the lease between petitioner and the corporation, discussed supra↩, called for payment of the corporation's telephone bills by petitioner. Petitioner has, however, failed to clarify whether that provision of the lease, or any other provision thereof, was respected by the parties.
26. We need not rule on respondent's objection to the admissibility of this subsequent year's return, as such a determination would have no bearing on our conclusion.↩
27. The corporation has conceded the nondeductibility of a $ 4,000 "charitable contribution" to petitioner's ULC charter.↩
**. Allowed as section 163 deduction. ↩
28. Petitioner's written motion in opposition to respondent's motion related to section 7609(e) states that petitioner "would consider dropping" the claim for an additional salary deduction of $ 4,995 in return for the Tax Court's dismissing the section 7609(e) issue.↩
29. At trial, petitioner was unable to testify as to when he started selling tapes to hypnosis patients. Aside from mentioning the tapes and making reference to a typewriter, petitioner failed to present any evidence of the quantity or character of the supplies and equipment allegedly purchased from the above-named payees.↩
30. While respondent allowed a deduction of $ 1,049.46 for postage, less than $ 300 in cancelled checks and receipts appear to be in evidence as substantiation of the claimed deduction.↩
31. At trial, petitioner suggested that a modification to the lease provision may have been made to account for the installation of a second telephone line at his residence in June, 1982. Petitioner promised to check on this point before the close of trial but failed to present any further testimony or clarification on this issue.↩
32. Respondent allowed a deduction of $ 30 based on a check in the amount of $ 38, apparently through a technical error.↩